[No. 52507-7-I.  Division One.  December 13, 2004.]

*In the Matter of the Dependency of* D.A.

THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent,*
v. C.A., *Appellant.*

*Cheryl D. Aza* and *Corey M. Endo* (of *Washington Appellate Project*), for appellant.

*Christine O. Gregoire, Attorney General*, and *Mary F. Li, Senior Counsel*, for respondent.

*Heidi L. Nagel* (of *King County Dependency CASA Program*), for guardian ad litem.

¶1 ELLINGTON, A.C.J. — In this termination of parental rights case, the chief issue is whether the necessary services capable of correcting parental deficiencies were offered, despite the failure of the Department of Social and Health Services (Department) to offer housing assistance services during a relevant time. The trial court found that all necessary services were offered, and substantial evidence supports that finding. We therefore affirm.

## BACKGROUND

¶2 On May 13, 1999, C.A. gave birth to D.A.[1] C.A., then 17, immediately faced significant challenges. She was still attending high school. She had mental health issues, a learning disability, and an IQ bordering on mental retardation. And she lived with parents who had serious problems of their own. Her father was an alcoholic with a history of mental illness, and her mother had mental health issues as well.

¶3 C.A. relied upon her parents to help care for her son. On April 19, 2000, C.A.'s father became angry and struck D.A. while changing the child's diaper, then threatened to kill C.A. A Child Protective Services (CPS) social worker interviewed C.A. the next day. D.A. was well nourished and had no visible marks or injuries. C.A. refused to move to a teen parent home, but agreed to accept daycare and home support services. She did not follow through with services.

¶4 Later that summer, C.A.'s mother moved out. She told CPS she left because C.A.'s father was increasingly physically abusive to her and to C.A. C.A. reported to CPS that her father had "threatened her if she tries to leave his home with [D.A.]"[2]

¶5 On July 30, 2000, C.A. planned to take D.A. to see her mother. Her father objected, and wanted C.A. to stay with him, and not leave the house with D.A. Their altercation became physical, and when it ended, C.A. had a broken leg.[3] Police were called. At the hospital, C.A. again refused to move to a teen parent home, but asked that D.A. be placed in foster care to protect him from his grandfather while she recovered.

¶6 D.A. was removed from his grandfather's home and placed in foster care. After C.A. left the hospital, she stayed

---

[1] The paternity of D.A. has never been established. The alleged father's parental rights were terminated by default and are not at issue in this appeal.

[2] Clerk's Papers at 3.

[3] C.A. testified she fell over the baby gate. Other witnesses testified she admitted her father broke her leg.

for a week with her mother. But then, although C.A. told her mother she thought her father would hurt her again, she returned to her father's home.

¶7 In October 2000, C.A. signed an agreed order of dependency, stipulating to most of the facts set forth above. The court ordered domestic violence counseling, parenting classes, a psychological evaluation and any recommended treatment, and ordered C.A. to establish a safe, stable living environment outside her father's home. The plan was for C.A. and D.A. to move in with C.A.'s mother. A schedule of supervised visitation was authorized.

¶8 C.A. did not move out of her father's home. Her mother became unavailable as a housing resource after she was jailed for assaulting C.A.'s father. C.A.'s caseworker offered help in finding another living arrangement, but C.A. refused; she later testified she "told them hell no."[4] C.A. also did not comply with the other court-ordered services, did not return caseworker phone calls, and visited D.A. only twice. In December 2000, the Department moved D.A. into a placement that could provide a permanent adoptive home.

¶9 At the first dependency review in January 2001, the court found that C.A. was ready to do services and adopted a plan projecting D.A.'s return to C.A. in July 2001. C.A. began regular visits with D.A. arranged by her new caseworker, Tom Kerns.

¶10 In February, C.A. participated in a court-ordered psychological evaluation. The evaluation revealed paranoia, resentment of authority, adjustment disorder with anxiety and depression, and further revealed that C.A. did not possess basic parenting skills or understand why her father's home was unsuitable for raising a child. The evaluator recommended mental health services, parenting classes suitable for C.A.'s developmental disabilities, and that she find a safe and stable home. The evaluator also recommended referral to the Division of Developmental Disabilities (DDD). This referral would have included residential

---

[4] Report of Proceedings (RP) (Apr. 21, 2003) at 88.

assistance. Kerns made the referral, but C.A. did not complete the application. She also did not comply with the other services ordered or find an alternate living arrangement.

¶11 At a permanency planning hearing in June 2001, C.A. was not in compliance with parenting classes, mental health counseling, developmental disability services, or domestic violence counseling. The court changed the primary plan from reunification to adoption, with an alternate plan of return to mother, and directed the Department to file a petition for termination.

¶12 C.A. thereafter made efforts to comply with services. She completed the DDD application in late summer, but was found ineligible. At the December review hearing, she still had not complied with court-ordered mental health services and domestic violence counseling, and still had not secured housing outside her father's home. In June 2002, C.A. was engaging in the required services but still had not relocated. The court denied C.A.'s request to reinstate the primary plan of reunification.

¶13 A termination petition was signed by Kerns on July 10. That month, with the help of her domestic violence advocate, C.A. applied to Straley House, a supported housing program for homeless young adults.

¶14 In August 2002, the Department of Social and Health Services (DSHS) filed the petition to terminate C.A.'s parental rights. Two months later, C.A. moved into Straley House. By the time of trial in April 2003, C.A. was first on a waiting list for Harmony House, a supported parent-child housing program. The Harmony House program is one to two years. Trial witnesses were unable to predict whether C.A. would be able to parent D.A. independently after completing the Harmony House program.

¶15 The trial court acknowledged that C.A. had obtained some services without the help of the Department, but concluded that all necessary services had been offered or

provided.[5] The court found that C.A. was not capable of parenting D.A. on her own; that dependency had already endured for three years, which was "way beyond"[6] the time frame contemplated by the statute; that continuing the dependency an additional one to two years to see if C.A. could succeed at Harmony House was outside the near future of the child as contemplated by the statute; and that C.A.'s likelihood of success was speculative in any event. The court noted that C.A. had never lived on her own, had no family support, and would not have structured, supported housing on a long term basis. Finally, the court found that a failed reunification would be "disastrous"[7] for D.A. The court terminated C.A.'s parental rights.

## DISCUSSION

¶16 An order terminating parental rights may be entered when the six statutory elements set forth in RCW 13.34.180 are established by clear, cogent, and convincing evidence, and the court finds that termination is in the best interests of the child.[8] "Deference paid to the trial judge's advantage in having the witnesses before him is particularly important in deprivation proceedings."[9] Thus, "[i]f there is substantial evidence which the lower court could reasonably have found to be clear, cogent and convincing, an appellate court should not disturb the trial court's findings."[10]

¶17 C.A. contends three of the six termination criteria in RCW 13.34.180 were not proven by clear, cogent, and

---

[5] The trial court ruled that "[i]n evaluating whether [the services] requirement has been met, the court considers services offered or provided to the mother from all sources, not just the services selected or referred by DSHS." Clerk's Papers at 81.

[6] Clerk's Papers at 82.

[7] Clerk's Papers at 84.

[8] RCW 13.34.190.

[9] *In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980).

[10] *Id.*

convincing evidence.[11] She also contends termination was not in D.A.'s best interest.

¶18 *Adequacy of Services.* C.A. first challenges the court's finding that all court-ordered services and all necessary, reasonably available services capable of correcting her parental deficiencies within the foreseeable future were offered or provided. C.A. contends the Department failed to provide or adequately assist her in obtaining three necessary services, and that this failure delayed her efforts to satisfy the requirements of the disposition order. The Department responds that all necessary services were offered or provided and contends it is immaterial how C.A. ultimately obtained a particular service.

█ █ ¶19 C.A. is correct that it is the State's duty to provide all court-ordered and necessary services[12] and to offer services that are tailored to each parent's needs.[13] At a minimum, it must provide a parent with a list of referral agencies that provide those services.[14] The Department is correct that the court may consider any service received, from whatever source, bearing on the potential correction of

---

[11] The three challenged criteria require the court to find the following:

(d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

(e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. A parent's failure to substantially improve parental deficiencies within twelve months following entry of the dispositional order shall give rise to a rebuttable presumption that there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. The presumption shall not arise unless the petitioner makes a showing that all necessary services reasonably capable of correcting the parental deficiencies within the foreseeable future have been clearly offered or provided. . . .

(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1).

[12] *In re Welfare of Hall*, 99 Wn.2d 842, 850, 664 P.2d 1245 (1983); *In re Dependency of P.D.*, 58 Wn. App. 18, 25, 792 P.2d 159 (1990).

[13] *P.D.*, 58 Wn. App. at 29.

[14] *Hall*, 99 Wn.2d at 850.

parental deficiencies.[15] This does not, however, mean that the source of a service is necessarily immaterial. A parent forced to search out services independently may need more time to navigate the system, may have greater difficulty complying with court orders, and may be undermined in efforts toward reunification.

¶20 The Department provided a psychological evaluation, mental health counseling, visitation services, individualized parenting classes, and referral to the DDD. The Department offered, but C.A. did not accept, housing relocation assistance. In cooperation with the Department, Betty Cherry, D.A.'s court appointed special advocate (CASA), provided many services, including transportation, assistance with obtaining public assistance and medical coupons for mental health services, help with the DDD application process, visitation support, and some housing relocation assistance. Mark Everds, a social worker with Society of Counsel Representing Accused Persons, also provided services, particularly housing assistance. Still other services C.A. obtained on her own from New Beginnings and Childhaven.

¶21 C.A. first contends the Department failed to offer her domestic violence counseling. Caseworker Tom Kerns testified that C.A.'s first caseworker, Diana Hall, had referred C.A. to a domestic violence instruction provider and C.A. had not complied. Hall did not testify, however, and Kerns had no documentation to support the referral. Nevertheless, two months before the termination petition was filed, C.A. completed a domestic violence class at New Beginnings. She does not explain how receiving this service from the Department would have made a difference.

¶22 C.A. also criticizes the Department's efforts regarding parenting instruction. It is undisputed, however, that Kerns referred her to Carol Haynes for eight sessions of individualized parenting instruction. Kerns then tried, unsuccessfully, to get authorization for additional sessions.

---

[15] *In re Dependency of C.T.*, 59 Wn. App. 490, 496-97, 798 P.2d 1170 (1990).

Immediately after the sessions with Haynes ended, C.A. found and attended parenting classes through Childhaven.

¶23 C.A.'s strongest argument is that the Department failed to assist her in finding safe and stable housing. The primary issue leading to the dependency of D.A. was the risk posed by C.A.'s insistence on remaining in her father's home. All the professionals involved, including the parenting skills instructor, the psychologist, the CASA, the mental health counselor, the domestic violence advocate, Everds, and certainly the caseworkers and the court, made strong efforts to persuade C.A. to find other housing, and there is no doubt that she understood the centrality of this requirement. There is also no question that housing services were offered by the Department. C.A. concedes that her first caseworker provided a list of housing options in the fall of 2000, that she vehemently refused them, and that she did not return her caseworker's phone calls.

¶24 In early 2001, Tom Kerns referred C.A. to the DDD for various services, as recommended by the psychological evaluation. DDD could have provided housing referrals and was viewed as a primary resource for C.A. because she had no family support. C.A. at first refused to complete the paperwork. With the persistent help of Betty Cherry, she submitted her application in late summer. In fall of 2001, however, DDD found C.A. ineligible for its services. Despite being informed of her right to appeal, C.A. did not appeal the rejection. Kerns made no more referrals for housing because, given C.A.'s disabilities, the options were limited, and C.A. had rejected the referrals made earlier.

¶25 In January 2002, C.A. wrote Kerns a letter. In it, she listed services she had completed or was attempting to complete, including this statement: "Housing[;] I will have somebody help me get a place . . . maybe Ebony."[16] Kerns did not follow up.

¶26 C.A. contends that her letter in January should have prompted assistance from the Department. The Depart-

---

[16] Ex. 13. Ebony was C.A.'s domestic violence advocate at New Beginnings.

ment invokes the rule that a parent's failure to make use of offered services excuses it from providing additional services.[17] We do not believe, however, that the Department may ignore a request[18] just because services have been previously declined. Further, the Department was aware of C.A.'s cognitive challenges and mental health issues. The Department should have followed up when C.A. communicated her readiness to find housing.

¶27 But despite the Department's inertia, C.A. had referrals for housing. Betty Cherry told C.A. from the outset that she needed to move out of her father's home, but C.A. would not consider it. Cherry was persistent and eventually took her to investigate a housing option. C.A.'s domestic violence advocate, Ebony, helped her get into Straley House. Mark Everds, her social worker with the Society of Counsel Representing Accused Persons, began working with C.A. in the fall of 2001; he too worked to find her housing, especially after she was rejected for services at DDD. Like Kerns, Everds believed C.A.'s efforts to move were impeded by her father, who was mentally abusive and did not want her to be independent. Everds emphasized that C.A. lived in fear of her father and did not know whom to trust. In the spring of 2002, Everds referred C.A. to Harmony House, where she was eventually accepted. The Department was generally aware of the efforts of the other advocates, working closely with Cherry, encouraging Ebony, and consulting with Everds.

¶28 It is not surprising that efforts to help C.A. find other housing were unsuccessful. She testified at trial that she did not move because she was scared of losing her family and of being unable to care for herself. She admitted that she first became willing to move out of her father's home when the Department filed the termination petition: "Q: When did you decide that you were not scared, and you

---

[17] *In re Dependency of Ramquist*, 52 Wn. App. 854, 861, 765 P.2d 30 (1988); *In re Dependency of T.R.*, 108 Wn. App. 149, 163, 29 P.3d 1275 (2001).

[18] Strictly speaking, C.A. did not make a request; she reported her own efforts. But her letter clearly indicated she was looking for help in finding housing.

were ready to move out? A: The same time that they told me that he could be adopted and I would never see him again. Q: Was that when the termination petition was filed? A: Yes."[19]

¶29 Betty Cherry testified C.A. knew from the beginning that she had to move, and often said she would, but was just unable to act. This observation is consistent with C.A.'s occasional enthusiasm for the idea of finding other housing and her apparently simultaneous inability to act on such a plan. (Cherry also believed that despite C.A.'s recent progress, she would return to her father's house if anything went wrong.) Cherry described C.A. as initially timid, confused, and fearful of the social services system, seeming to think the social workers "were trying to harm her instead of help her."[20] She testified that it took many meetings to convince C.A. to visit D. A. and to return her caseworker's phone calls; C.A. was afraid of the caseworker and did not seem to understand what a visitation was. Cherry initially contacted C.A. at her high school because C.A. would not return her calls. Cherry believed C.A. "didn't realize that she had to work with them in order to get the child back."[21]

■ ¶30 Given C.A.'s unwillingness to move until August, 2002, and the assistance offered to her by Ebony, Cherry, and Everds, the inadequacy of the Department's efforts after her letter in January cannot be said to be the cause of her failure to establish safe and stable housing for D.A. It is unclear what the Department could have done to persuade her to move earlier, or to find her a placement sooner, when the advocates she trusted could not. Even where the State inexcusably fails to offer a service to a willing parent, termination is nonetheless appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future.[22]

---

[19] RP (Apr. 21, 2003) at 89-90.

[20] RP (Apr. 22, 2003) at 163.

[21] Id.

[22] T.R., 108 Wn. App. at 164.

¶31 We emphasize, however, that the responsibility for offering or providing services belongs to the Department, and the Department cannot just point to the efforts of others if its own efforts might have succeeded where the others did not.

¶32 *Likelihood of Remedying Conditions in the Near Future.* C.A. challenges the court's finding under RCW 13.34.180(1)(e) that "[t]here is little likelihood that conditions will be remedied so that the child can be returned to the mother within the near future."[23] She contends the court overlooked the fact that a place at Harmony House was available within a few months. This argument assumes that the possibility of returning D.A. to C.A. in a supported housing setting would satisfy RCW 13.34.180(1)(e). It would not.

¶33 This statutory factor is concerned with "whether parental deficiencies have been corrected."[24] As the trial court noted, no witness testified that C.A. was ready to parent D.A. on her own without support, and there did not appear to be family or professional support available to C.A. when placement at Harmony House ended. There was general agreement that it would take at least a year at Harmony House before it would be clear whether C.A. could parent D.A. on her own. Everds took the position that C.A. had earned the opportunity to try and testified that 18 months at Harmony House would permit a final determination as to C.A.'s ability to care for D.A. As to what would happen after 18 months, however, Everds testified: "[T]hat's an essential question . . . and my opinion is that it's unknown right now."[25] As the trial court found, however, even if the 18 months at Harmony House had been

---

[23] Clerk's Papers at 84.

[24] *In re Dependency of K.R.*, 128 Wn.2d 129, 144, 904 P.2d 1132 (1995).

[25] RP (Apr. 23, 2004) at 103-04.

certain to give C.A. the skills she needs, this is beyond the "near future" for D.A.[26]

¶34 *Effect of Parent-Child Relationship on Prospects for Early Integration.* The trial court found that "[c]ontinuation of the parent-child relationship . . . clearly diminishes the child's prospects for early integration into a stable and permanent home."[27] C.A. contends this finding is not supported by clear, cogent, and convincing evidence. She concedes that placement at Harmony House would not be a permanent home. She argues, however, that "this should not be held against [her]" because families move and "[a]ny instability created by such a move is not uncommon in everyday life, no matter who is parenting a child."[28]

¶35 But the statute is not concerned with the permanence of a particular residential location. Rather, the statute is focused on the permanence and stability of the *placement.* In this case, the proposed placement with C.A. at Harmony House would not be permanent, and the dependency would have to continue for another one to two years before a permanent determination could *perhaps* be made. Because the Department met its burden of proving there is little likelihood C.A. can parent D.A. in the near future, it follows that her parental relationship interferes with D.A.'s integration into a stable and permanent home.[29]

¶36 *Best Interests of the Child.* If the factors in RCW 13.34.180 are proved by clear, cogent, and convincing evidence, the trial court then considers whether the State proved by a preponderance of the evidence that termination

---

[26] *See T.R.,* 108 Wn. App. at 165-66 (one year not "foreseeable" or "near" future for six-year-old child); *Hall,* 99 Wn.2d at 851 (eight months not in foreseeable future of four-year-old child); *P.D.,* 58 Wn. App. at 27 (6 months not in the near future of 15-month-old child); *In re Dependency of A.W.,* 53 Wn. App. 22, 32, 765 P.2d 307 (1988) (one year not in the near future of three-year-old child).

[27] Clerk's Papers at 84.

[28] Appellant's Br. at 35.

[29] *T.R.,* 108 Wn. App. at 166 (quoting *In re Dependency of J.C.,* 130 Wn.2d 418, 427, 924 P.2d 21 (1996)).

is in the child's best interests.[30] The trial court found termination was in D.A.'s best interest. That finding is supported by substantial evidence.

¶37 As the trial court noted, D.A. had been dependent since the age of 14 months; at the time of trial he was four. He had been in the same foster home since the age of 18 months. His foster parents wish to adopt him. C.A. could not be ready to parent D.A. on her own for at least another one to two years. The testimony was that despite C.A.'s now-regular visits, there was little bond between her and D.A.

¶38 Everds testified that if things did not work out at Harmony House, D.A. would benefit in the long run because he would have established a relationship with his mother. The trial court emphatically disagreed: "If placement with the mother did not work out and the child had to again be placed in foster care it would be disastrous for the child."[31] In that regard, the State presented evidence that D.A.'s current foster home might not be available if placement at Harmony House failed; potential adoptive placement is an appropriate factor for consideration under these circumstances.[32]

¶39 Considering the evidence in light of our duty "to place '*very strong* reliance on trial court determinations of what course of action will be in the best interests of the child,' "[33] the record supports the finding that termination is in D.A.'s best interest.[34]

---

[30] *Id.* at 166-67.

[31] Clerk's Papers at 84.

[32] *See Hall*, 99 Wn.2d at 848.

[33] *In re Pawling*, 101 Wn.2d 392, 401, 679 P.2d 916 (1984) (quoting *In re Welfare of Todd*, 68 Wn.2d 587, 591, 414 P.2d 605 (1966)).

[34] C.A. also argues that the statutory criteria prerequisite to a determination of the child's best interest were not proved; therefore, the court's finding that termination is in D.A.'s best interest was premature. But as discussed above, the record supports the court's findings on those statutory factors. Accordingly, this argument fails.

## CONCLUSION

¶40 This is a difficult case. There was no evidence that C.A. ever harmed or neglected her child, and there is no question of her devotion to him. He was removed from her care as a result of steps she took to protect him. And in her attempts to correct her parental deficiencies, C.A. was hampered by circumstances and by her disabilities, resulting in a resistance to services. D.A. was removed from her care in April 2000; not until June 2002 was C.A. fully compliant with court-ordered services. But the primary reason for the dependency was the need for a safe and stable home for D.A. Despite understanding the centrality of this requirement, she was unwilling to act on it until August 2002. This was too late.

¶41 The trial court expressed great sadness in deciding termination was appropriate, and we express the same regret. The court found, however, that all necessary services had been offered, or provided, and substantial evidence supports that finding. On the other challenged issues, the court's findings are clearly correct. We therefore affirm.

BAKER, J., concurs.

¶42 KENNEDY, J. (dissenting) — I agree with the majority's conclusion that the Department inexcusably failed to fulfill its statutory obligation to provide C.A. with all necessary services. I disagree with the majority's holding that this failure did not prejudice C.A.'s efforts to timely complete all court-ordered requirements. Therefore, I dissent.

¶43 A principal goal of dependency and termination proceedings is to reunify parents with their children.[35] The legislature has entrusted the Department of Social and

---

[35] The primary purpose of a dependency adjudication is to allow courts to order remedial measures to preserve and mend family ties, and to alleviate the problems which prompted the State's initial intervention. *Krause v. Catholic Cmty. Servs.*, 47 Wn. App. 734, 744, 737 P.2d 280 (1987); *In re Dependency of Chubb*, 46 Wn. App. 530, 536, 731 P.2d 537 (1987) (quoting *In re A.M.D.*, 648 P.2d

Health Services (Department) with the job of providing parents the services they need to achieve that end. The importance of this role cannot be overemphasized. As the trial court's findings in this case amply demonstrate, time is of the essence in dependency and termination proceedings, and failure to timely provide a parent with necessary services may fatally undermine the parent's efforts to timely complete court-ordered requirements. The Department's role is particularly crucial when a parent attempting to complete services within a tight timetable is disadvantaged in his or her efforts by disabilities or other circumstances. In this case, C.A. was disadvantaged both by her home circumstances and her cognitive deficiencies. In a case of this nature, more, not less, should be expected of the Department.

¶44 Nevertheless, despite C.A.'s patent disadvantages and closing window of opportunity, the Department offered her no housing assistance from the fall of 2001 until after the termination petition was filed in August 2002. The majority concludes, and I concur, that the Department failed to fulfill its statutory obligation to C.A. during this crucial period of the dependency. The majority then applies the rule that "[e]ven where the State inexcusably fails to offer a service to a willing parent, termination is nonetheless appropriate if the service would not have remedied the parent's deficiencies in the foreseeable future."[36] Citing "[C.A.]'s unwillingness to move until August 2002, and the assistance offered to her by Ebony, Cherry, and Everds," the majority concludes that the Department's failure cannot be said to have caused C.A.'s failure to comply with the housing requirement. I disagree for several reasons.

---

625, 640 (Colo. 1982)). *See also McKinney v. State*, 134 Wn.2d 388, 404, 950 P.2d 461 (1998).

[36] (Citation omitted.) Majority at 655.

¶45 First, the evidence that C.A. received housing assistance from other sources in 2002 is minimal.[37] Second, the assumption that C.A. was not motivated to move into housing until August 2002 ignores her extraordinary efforts and progress during the previous year. It was during that period that C.A., with little assistance and facing significant obstacles, completed virtually every court-ordered service. In the spring of 2002, she demonstrated her motivation to comply with the housing requirement by finding and arranging her own appointment with Straley House. These are not the actions of an unwilling parent.

¶46 Third, but for the Department's omission, the course of these proceedings likely would have changed. At the June 2002 dependency review, the court found that C.A. had complied with every court-ordered service and requirement except housing. Had C.A. been accepted into a housing program by that point, the court likely would have changed the primary plan from adoption to reunification and/or delayed the filing of the termination petition.

¶47 Finally, when the Department fails to fulfill its statutory obligations to a parent in a termination case, it should bear the burden of demonstrating that its omissions did not prejudice that parent. I would hold that the Department has not carried that burden in this case. The Department has not shown that C.A. received sufficient housing assistance or that additional timely assistance would not have changed the course of these proceedings.

¶48 In addition, a fundamental prerequisite for termination is not present here. In order to be constitutional, a termination decision must be based on a finding of current

---

[37] A review of the record shows that C.A. received no significant housing assistance in 2002 and was, for the most part, left to fend for herself. Everds talked to a supervisor at Harmony House and gave C.A. her phone number, but C.A. did the rest. Ebony helped C.A. fill out an application to Straley House, but it was C.A. who searched out and found that housing. Finally, at C.A.'s request, Betty Cherry stopped by a potential housing location in June 2002. The lack of proactive housing assistance handicapped C.A.'s efforts to timely comply with the court's housing requirement.

parental unfitness.[38] Our courts have held that parental unfitness is implicitly established once the State satisfies the statutory criteria for termination.[39] Here, the Department did not meet the statutory criteria and cannot demonstrate that C.A. was not prejudiced by its failure. Moreover, there was no evidence in this case that C.A. ever harmed or neglected her child. And although Betty Cherry opined that she did not think C.A. was yet capable of taking care of D.A. on her own, no one testified that C.A. is unfit to parent D.A. I cannot countenance a presumption of parental unfitness where the record refutes it.

¶49 Review of this case is made extremely difficult by the fact that D.A. wants to be adopted by his foster family and could well be damaged emotionally by reversal of the termination and reinstatement of the dependency. Nevertheless, reversal of the termination and reinstatement of the dependency is the only available remedy for the Department's failure to provide all necessary services in this case. Thus, reluctantly, I respectfully register my dissent.

Review denied at 154 Wn.2d 1030 (2005).

---

[38] *In re Dependency of K.R.*, 128 Wn.2d 129, 142, 904 P.2d 1132 (1995); *In re Welfare of H.S.*, 94 Wn. App. 511, 523, 973 P.2d 474 (1999).

[39] *In re Dependency of J.C.*, 130 Wn.2d 418, 428, 924 P.2d 21 (1996).