
# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of J.N.C. ) | No. 68859-6-I |
| ) | |
| STATE OF WASHINGTON, ) | DIVISION ONE |
| DEPARTMENT OF SOCIAL AND ) | |
| HEALTH SERVICES, ) | UNPUBLISHED OPINION |
| ) | |
| Respondent, ) | |
| ) | |
| v. ) | |
| ) | |
| DONNA LYNN RUBLE, ) | |
| ) | |
| Appellant. ) | FILED: April 29, 2013 |
| ) | |

APPELWICK, J. — For over two years after her son was found dependent, Ruble failed to make progress toward addressing her parental deficiencies and remains in denial about her substance abuse. The trial court terminated her parental rights. We affirm.

## FACTS

J.C. is blind, deaf, and appears to be autistic. He requires 24 hour care due to his exceptional vulnerabilities. In July 2009, his older brother, D.C., called 911 to report their mother's erratic behavior. As a result of his call, Donna Ruble was hospitalized for being intoxicated. She had a blood alcohol content of .485. Ruble was subsequently

hospitalized two more times. D.C. reported similar behavior on those occasions, but Ruble declined blood alcohol content tests at the hospital.

J.C. was removed from Ruble's custody in August 2009. He was found dependent in December 2009, when he was 15 years old. The dispositional order required Ruble to participate in a drug and alcohol evaluation and follow treatment recommendations, participate in scheduled urinalysis testing, and complete a psychological evaluation with a parenting component and follow treatment recommendations. The psychological evaluation was to take place after Ruble provided 30 days of clean urine samples.

Ruble completed a substance abuse assessment at New Traditions in December 2009. Although it was recommended that she participate in inpatient drug treatment, she unilaterally determined she only needed outpatient treatment. She attended only two group sessions at New Traditions. After a month of not showing up for scheduled sessions, she contacted her counselor, Shino Harada, and requested information about other treatment agencies closer to her home. Harada gave Ruble the contact information for Community Psychiatric Clinic and recommended that she enter a co-occurring disorder group to address her mental health and substance abuse issues. There is no indication that she followed-up on that referral.

Ruble participated in another substance abuse evaluation at Sound Mental Health (SMH) in June 2010. SMH determined that Ruble was alcohol dependent and recommended intensive outpatient treatment including four groups per week, four sober support meetings per week, and two one-on-one sessions with her counselor per month for 90 days. Ruble participated in treatment from June until December 2010. But,

during that time she was often non-compliant. She missed group sessions and sober support meetings, and was altogether absent from treatment for extended periods of time. Ruble was discharged in February 2011. Despite the fact that intensive outpatient treatment normally takes 90 days and that Ruble was enrolled for approximately nine months, she never completed the program.

In November 2010, Dr. Michael O'Leary issued a psychological evaluation report. He diagnosed Ruble with "Alcohol Dependence (in early remission), Anxiety Disorder Not Otherwise Specified, Parent-Child Relationship Problem, Rule-Out Somatoform Disorder Not Otherwise Specified, and Mixed Personality Disorder with histrionic, avoidant, and passive-aggressive features." Dr. O'Leary determined that Ruble was in denial about her substance abuse, and he was unable to conceive of any services that would be likely to remediate her deficiencies, because of the depth of her denial. He opined that J.C. would be at active risk if he was placed with a caregiver with those types of issues and stated that anyone involved in decision-making for J.C. should be sober.

At hearings in March 2010, August 2010, December 2010, June 2011, November 2011, and April 2012, the court determined that Ruble had not made progress toward remedying the parental deficiencies that necessitated J.C.'s removal. Meanwhile, J.C. made significant progress in foster care. He gained weight and stamina, and improved his self-care and occupational skills.

In October 2011, the State petitioned to terminate Ruble's parental rights. After six days of testimony in April 2012, the trial court entered findings of fact and conclusions of law. Based on its findings, it terminated Ruble's parental rights. J.C.

was at that time 17 years old. In addition to citing J.C.'s specific needs, Ruble's substance abuse, and Ruble's extreme level of denial, the trial court found that Ruble was not a credible witness. It found that Ruble's "perception of events is often skewed and self-serving," that her "recitation of history is not reliable or consistent," and that she lied to substance abuse counselors and failed to follow court orders. In short, it concluded that "truth is malleable" to Ruble.

## DISCUSSION

Parents have a fundamental liberty interest in the care and welfare of their children, and State interference is never to be taken lightly. In re Dependency of Schermer, 161 Wn.2d 927, 941, 169 P.3d 452 (2007). But, the State has an interest in protecting the physical, mental, and emotional health of children, as well. Id. To terminate parental rights, the State must first prove the six elements of RCW 13.34.180 by clear, cogent, and convincing evidence. In re Dependency of K.N.J., 171 Wn.2d 568, 576-77, 257 P.3d 522 (2011). Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be highly probable. In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995). The six requirements are:

> (a) That the child has been found to be a dependent child;
>
> (b) That the court has entered a dispositional order pursuant to RCW 13.34.130;
>
> (c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
>
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary

services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;

   (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . . ; [and]

   (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW.13.34.180(1). Once these six statutory elements are met, the State must still prove by a preponderance of the evidence that termination is in the best interests of the child. RCW 13.34.190(1)(b); K.N.J., 171 Wn.2d at 577.

On appeal, findings of fact must be supported by substantial evidence in light of the clear, cogent, and convincing standard. State v. Broadaway, 133 Wn.2d 118, 131, 942 P.2d 363 (1997); K.N.J., 171 Wn.2d at 576-77. We do not weigh the evidence or credibility of the witnesses. In re Welfare of Aschauer, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). Rather, we give deference to the trial court's advantage in directly observing witness testimony. Id. Unchallenged findings of fact are verities on appeal. In re Interest of J.F., 109 Wn. App. 718, 722, 37 P.3d 1227 (2001).

Ruble argues that the State failed to establish that it promptly offered or provided all necessary, reasonably available services, that the continuation of the parent-child relationship clearly diminishes J.C.'s prospects for early integration into a stable and permanent home, or that it is in J.C.'s best interests to terminate Ruble's parental rights.[1]

---

[1] Ruble also assigns error to the trial court's findings that Ruble would not adequately redirect J.C.'s inappropriate sexual behavior because she does not recognize the problems with the behavior, and that the behavior is a learned trait that is attributable to Ruble. But, she offers no argument in support of the assignment of error. Failure to accompany an assignment of error with argument precludes appellate

5

I.  Necessary, Reasonably Available Services

Ruble argues that the State did not meet its obligations in this case, because it did not timely provide a referral for a psychological evaluation or offer a referral or funding for mental health counseling. She contends that the State knew of Ruble's need for mental health services even before J.C. was found dependent in December 2009, but did not refer her for a psychological evaluation until July 2010. Then, in November 2010, the doctor who performed her psychological evaluation concluded that any services that could be helpful to Ruble "would be outside of the timeframe allowed the [State] for establishing permanency."

Ruble's argument disregards key facts. Ruble was to complete the psychological evaluation after 30 days of clean urine samples. It is unclear when she first reached that threshold, but the record establishes that as of March 2010 she had not yet complied. And, although Dr. O'Leary testified that any services that could be helpful would be outside of the State's timeframe, he was referring to substance abuse treatment, not mental health services. His comments came in the broader context of explaining the extraordinary level of Ruble's substance abuse. Due to the depth of her abuse and the severity of her denial, he determined that any effective treatment would be "very slow and gradual."

More importantly, Ruble <u>was</u> referred to mental health services. Shortly after the dependency was entered in December 2009, Ruble was scheduled to begin substance abuse treatment at New Traditions. She attended treatment only twice, and missed

---

consideration. <u>Escude v. King County Pub. Hosp. Dist. No. 2</u>, 117 Wn. App. 183, 190 n.4, 69 P.3d 895 (2003).

scheduled treatment on multiple occasions. In January 2010, Ruble called Harada and asked for a referral to a different treatment program closer to her home. Harada referred Ruble to Community Psychiatric Clinic and recommended that she participate in a co-occurring disorder group that addressed her mental health and substance abuse issues. There is no evidence that she followed up on that referral, despite the fact that the dependency order required her to follow treatment recommendations. As previously explained by this court, there is no requirement that all necessary, reasonably available services be offered or provided by the State itself:

> [T]he court may consider any service received, from whatever source, bearing on the potential correction of parental deficiencies. This does not, however, mean that the source of a service is necessarily immaterial. A parent forced to search out services independently may need more time to navigate the system, may have greater difficulty complying with court orders, and may be undermined in efforts toward reunification.

In re Dependency of D.A., 124 Wn. App. 644, 651-52, 102 P.3d 847 (2004) (footnote omitted). Here, Ruble was not left to search out services independently. She was promptly referred to a clinic closer to her home, as she requested. She received the referral in the month after the dependency was entered. And, she makes no argument that she was in any way delayed by the fact that the initial referral came from a treatment provider instead of the State.

Further, later in the dependency she repeatedly misrepresented that she was receiving mental health counseling. At a June 2011 permanency planning hearing, Ruble reported that she was receiving mental health services from Sound Mental Health, but she did not sign the release that would allow the State to verify her report. The court ordered her to sign the release. At a November 2011 dependency review

hearing, the court learned that Ruble had still not signed the release. The court again ordered her to sign it. The State is not required to offer additional services when the services are unlikely to correct parental deficiencies within the foreseeable future and when offering services would be an exercise in futility. In re Dependency of P.D., 58 Wn. App. 18, 26-27, 792 P.2d 159 (1990).

Ruble was referred to mental health counseling by her substance abuse counselor early on in the dependency. Under the dependency order, she was ordered to follow all treatment recommendations. Nevertheless, she did not follow-up on the referral. Later, she affirmatively misrepresented to the State and the court that she was receiving mental health counseling. Substantial evidence supports the court's finding that all necessary, reasonably available services were offered or provided.

II.    Integration Into a Stable and Permanent Home

Ruble makes two brief arguments in support of her contention that the trial court's finding that continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home is not supported by substantial evidence. First, she claims that J.C. was already in a stable placement and that his placement was not at risk, because he could remain in extended foster care until age 21. But, stability and permanence are not the same things. On its face, Ruble's argument admits that the foster placement is not permanent.

Second, Ruble asserts that no potential family had met J.C., that he was not in adoptive placement, that the State likes to have a child placed in a home for six months before finalizing an adoption, and that adoption was therefore unlikely to occur before J.C. turned 18. But, the State does not have to establish that a stable and permanent

8

home is available at the time of termination. In re Dependency of K.S.C., 137 Wn.2d 918, 927, 976 P.2d 113 (1999). The focus of the inquiry is whether the parent-child relationship impedes the child's prospects for integration. Id. Ruble does not challenge the court's finding that J.C.'s legal status was impeding his prospects for adoption:

> 2.60 Unrebutted testimony indicates that despite [J.C.]'s significant challenges, he has multiple prospects for adoption that cannot be fully realized until his legal status is addressed.

Indeed, a supervisor in the State's adoptions unit testified that there is a group of families in the community who have a passion to parent children like J.C. She explained that six families had inquired about J.C., and three had expressed interest in adopting him. She further explained that it was possible to finalize an adoption after a child turns 18, but that not being legally free was a barrier to adoption. The court's finding that J.C.'s legal status clearly diminishes his prospects for early integration into a stable and permanent home is supported by substantial evidence.

## III. Best Interests of the Child

Ruble argues that the trial court's determination that terminating her parental rights is in J.C.'s best interests is not supported by substantial evidence. Her entire challenge is that the evidence established that J.C. had a strong emotional bond to her, and it was not in J.C.'s best interests to take that bond away. But, she does not challenge the trial court's finding that, given J.C.'s challenges, "it is difficult to determine the depth of the bond." And, even assuming that J.C. is strongly bonded to Ruble, her argument does not account for the trial court's numerous uncontested findings that amply support its conclusion.

9

The trial court clearly explained that J.C. needs a caregiver and decision-maker who is sober, able to act consistently and appropriately, and able to facilitate his growth and independence:

> 2.32 . . . Dr. O'Leary concluded that [J.C.] would be at active risk if placed with a caregiver who had not identified or addressed their addiction issues and that anyone involved in decision-making for [J.C.] should be sober.
>
> 2.56 [J.C.] has a myriad of high needs and is likely to need ongoing care for the rest of his life. . . . [J.C.] is especially vulnerable and requires that his caregiver protect him but also allow him to establish and maintain boundaries to successfully socialize with others.
>
> 2.58 . . . [J.C.] requires that another individual make decisions on his behalf. The decision-maker for [J.C.] must demonstrate that they can act consistently and appropriately on his behalf with his best interests. [J.C.] does require a capable caregiver who is able to assist [J.C.] to become his most full and realized self by allowing him to achieve as great a level of independence as he can while at the same time protecting and providing for him.

The trial court further found that, due to Ruble's mental health, substance abuse, denial, and inability to care for herself, she is an ill-suited caregiver or decision-maker for J.C.:

> 2.32 The mother does not recognize the extensiveness of her deficits and consistently attempts to present herself as a person without problems of any kind, or at the very least, believes she can address them on her own. Ms. Ruble is overly confident and complacent in regards to her alcoholism. Dr. O'Leary . . . was unable to conceive of any specific services that are likely to remediate the mother's deficiencies because of her level of denial.
>
> 2.33 . . . Dr. O'Leary identified the mother's substance use as significant, particularly her blood alcohol level of .485, which would cause a light drinker to at best be in a coma. The mother's personality disorder is identified as markedly deviant from reality.
>
> 2.41 The mother's belief that she can stop drinking at any time and maintains recovery by abstinence is not supportive of long term sobriety or recovery.

10

2.42 The mother is not engaged in any service or support to support sobriety.

2.43 . . . Ms. [Ruble] admits saying whatever she thinks will be helpful in obtaining her desired result. Truth is malleable.

2.44 The mother to date has never completed the recommended level of substance abuse treatment to address her addiction to alcohol including inpatient drug treatment and intensive outpatient drug treatment.

2.45 The mother's continued minimization of her use of alcohol, her refusal to engage in the necessary treatment to address her substance dependence, and her lack of any ongoing support services for substance abuse treatment places her at high risk of relapse, which would place [J.C.] at great risk if in her care.

2.48 The mother has repeatedly identified or blamed others for this situation including [D.C.], her mother, the [State], her diabetes, and Seattle School system. The mother often engages in behavior that is concerning for her mental stability including stalking [D.C.] and his foster placement, allegedly threatening the parties to these proceedings, and accusing an . . . intern/visit supervisor of molesting [J.C.].

2.49 The mother's perception of events that have occurred with drug treatment, completion of her psychological evaluation, refusal to complete the parenting observation and her statements about case management offered to her causes significant concern regarding her mental health and her ability to follow through with recommendations for [J.C.] by his treatment providers as well as her ability to accurately recount information to the professionals in [J.C.'s] life in order for them to provide appropriate care.

2.50 The mother's refusal to engage in the services as recommended supports Dr. O'Leary's observations and testing that to the extent the mother denies problems with her behavior she will correspondingly be unable to remedy her deficits.

2.51 The mother has significant medical issues including diabetes that require ongoing monitoring and management. The mother's diabetes has been unstable and has required hospitalizations. The mother has gone long periods of time without consistent medical attention to monitor her diabetes. The mother's ability to model adequate physical and emotional self-care is questionable. The

mother's difficulty in this area causes concern about her ability to ensure she would follow through with [J.C.'s] high care needs.

2.57 The mother's mental health and alcohol dependence remain and place [J.C.] at great risk due to his inability to self-protect, advocate or disclose information.

2.58 The mother continues to exercise poor judgment that places [J.C.] at a unique risk.

2.59 The mother's inability to manage herself limits her ability to create and maintain a safe, stable, nurturing, protective environment that has structure and opportunities for [J.C.'s] development.

Ruble's inability to fill a role as J.C.'s caregiver or decision-maker is further underscored by J.C.'s marked improvement after he was removed from Ruble's care:

2.56 . . . [J.C.] has made significant progress while being in foster care related to self-care and occupational skills. He has gained weight and stamina while in foster care.

Taken together, the trial court's uncontested findings overwhelmingly support its determination that termination is in J.C.'s best interests.

We affirm.

WE CONCUR: