# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In Re Dependency of S.R.K., a Minor Child. | No. 87347-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

FELDMAN, J. — J.S. appeals the trial court's order terminating his parental rights to his child, S.R.K. Because substantial evidence supports the trial court's findings of fact and the findings support its conclusions of law, we affirm.

I

J.S. is the biological father of S.R.K., who was born in March 2018. In June 2019, the Department of Children, Youth, and Families (the Department) received an intake from Children's Hospital with concerns that S.R.K. had several fractured bones in multiple stages of healing. Because the parents and other family caregivers could not provide a plausible explanation for the injuries, the Department removed S.R.K. from his parents' custody and placed him with his paternal grandmother. Shortly thereafter, J.S. underwent a psychological and parenting evaluation. He received a diagnosis of chronic and complex post-traumatic stress disorder (PTSD) and a recommendation for counseling and possible medication management.

On February 4, 2021, the court entered an agreed order of dependency and disposition as to J.S.[1] The disposition required J.S. to participate in a psychological assessment with a parenting component and follow through with mental health counseling, medication management, parenting coaching, and all treatment recommendations. J.S. underwent additional psychological assessment in September 2021. According to the assessment, J.S. was "unable to demonstrate use of consistent mental health in order to deal with his multiple issues," and "needs help and does not have the maturity and skills to parent his son at this time."

In May 2022, S.R.K. returned to J.S.'s care for a trial return home. He was removed from J.S.'s care in October 2022 due to concerns about J.S.'s mental health challenges and use of physical discipline. After J.S. completed court ordered services, engaged in additional services and mental health treatment, and had successful overnight visits, the Department agreed to a second trial return home in February 2023. S.R.K. was removed from J.S.'s care again in September 2023 because of allegations of physical and psychological abuse. At that time, S.R.K. was placed with his maternal grandparents, who expressed an interest in adopting him.

S.R.K. was diagnosed with attention deficit hyperactivity disorder (ADHD) and PTSD. J.S. "does not believe that [S.R.K.] has either of these diagnoses" and encouraged S.R.K. to discontinue his medication. After the second failed return home, S.R.K. began exhibiting confrontational and aggressive behavior at home

---

[1] S.R.K. was also found dependent as to his biological mother, and her parental rights were subsequently terminated. She is not a party to this appeal.

and at school, as well as night terrors and bedwetting. He has episodes where he becomes extremely emotional and upset, destroying property and becoming physically violent. These episodes mostly occur after visits with J.S. J.S. visits regularly, and the two enjoy activities together. The visits have progressed from supervised to monitored, but have not progressed to unsupervised since the second failed return home.

The Department filed a petition for termination of J.S.'s parental rights in December 2023 and the termination trial occurred in September 2024. At the time of trial, S.R.K. had spent a total 31 months out of his father's care since entry of the agreed order of dependency and disposition. The court entered an order terminating J.S.'s parental rights on October 14, 2024. This timely appeal followed.

II

Under Washington law, the termination of parental rights is a two-step process. *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). The first step focuses on the adequacy of the parents and requires proof of six statutory elements by clear, cogent, and convincing evidence. *Id*. The three elements at issue here are:

> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
>
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . .
>
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. . . .

RCW 13.34.180(1)(d)-(f).[2]  Clear, cogent, and convincing evidence exists when the ultimate fact at issue is shown by evidence to be "highly probable." *In re Dependency of K.R.*, 128 Wn.2d 129, 141, 904 P.2d 1132 (1995).  If the Department satisfies the first step, the court proceeds to the second step, which is "determining if termination is in the best interest of the child." *In re Dependency of K.N.J.*, 171 Wn.2d 568, 577, 257 P.3d 522 (2011).  The Department must show that termination is in the best interests of the child by a preponderance of the evidence. *A.B.*, 168 Wn.2d at 911.

Because of the highly fact-specific nature of termination proceedings, we defer to the trial court's determinations of witness credibility and the persuasiveness of the evidence.  *In re Matter of K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016).  The trial court's findings of fact will not be disturbed unless clear, cogent, and convincing evidence does not exist in the record.  *Id*.  We review de novo whether the court's findings of fact support its conclusions of law.  *Id*. "[U]nchallenged findings of fact are verities on appeal." *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004).

A

Addressing the first step of the termination analysis, J.S. argues the Department failed to prove elements (d), (e), and (f) of RCW 13.34.180(1) (quoted

---

[2] The three other elements are:  "(a) That the child has been found to be a dependent child," "(b) That the court has entered a dispositional order pursuant to RCW 13.34.130," and "(c) That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency." RCW 13.34.180(1)(a)-(c).

above) by clear, cogent and convincing evidence. We address each element in turn.

1

Regarding element (d), J.S. contends that the Department did not expressly and understandably offer or provide a neurological evaluation. According to J.S., the Department did not ensure that he had a primary care doctor to make the referral or that he understood how to access a neurological evaluation and its importance. We disagree.

The Department must offer or provide "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). "A service is 'necessary' if it is needed to address a condition that precludes reunification of the parent and child." *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 921, 385 P.3d 268 (2016) (citing *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010)). Prior to terminating parental rights, the Department must "identify a parent's specific needs and provide services to meet those needs." *I.M.-M.*, 196 Wn. App. at 924. At a minimum, the Department must "provide a parent with a list of referral agencies that provide those services." *In re Dependency of D.A.*, 124 Wn. App. 644, 651, 102 P.3d 847 (2004). If the Department has reason to believe that a parent may have an intellectual disability, it must make reasonable efforts to determine whether the parent has a disability and ensure its offer of services is reasonably understandable. *In re Parental Rights to M.A.S.C.*, 197 Wn.2d 685, 689, 486 P.3d 886 (2021).

J.S. underwent a domestic violence evaluation in January 2024. The evaluation recommended 12 months of domestic violence treatment and noted J.S. would benefit from continued mental health services and exploration of "trauma therapy (EMDR) options."[3] Additionally, the assessment stated J.S. "may benefit from further medical assessment, due to reports of repeated trauma to the head during physical assaults, falls, and facial injuries." After learning of this history of head trauma, the Department social worker discussed with J.S. that he would need to obtain a referral to see a neurologist and offered her assistance. At the time of the termination trial in September 2024, J.S. had not yet received a referral from his primary care physician.

J.S. alleges that the Department "did not take actual steps to expressly and understandably offer" neurological evaluation. As to the steps taken, the Department social worker testified without contradiction that she offered to call J.S.'s primary care provider or accompany J.S. to see the provider to explain the need for a referral to a neurologist. She also provided J.S. with a list of neurologists near his residence and called offices to inquire about waitlists for appointments. These efforts—the provision of names of local neurologists and offers of help to obtain a referral from the primary care physician—equate to "a list of referral agencies" established as the minimum requirement for adequate provision of services. *See D.A.*, 124 Wn. App. at 651.

J.S. also argues that the record fails to establish that the Department understandably offered a neurological evaluation. According to J.S., the

---

[3] EMDR refers to "eye movement desensitization and reprocessing" therapy. *See Roake v. Delman*, 189 Wn.2d 775, 785, 408 P.3d 658 (2018).

Department knew he had complex PTSD and a possible brain injury which "could impact his ability to access services, remain in compliance with services as well as understand the importance of those services," and the record does not show that the Department properly tailored its services such that J.S. understood how to access a neurological evaluation. But the unchallenged findings of fact state that the two social workers and two psychological experts who engaged with J.S. never reported concerns about possible cognitive or intellectual impairment. J.S. does not argue and the record does not demonstrate that he struggled to understand any of the other services offered by the Department, including referrals for domestic violence assessment, substance use assessment, and mental health treatment. Given the lack of evidence that J.S. suffered from a cognitive or intellectual impairment, as well as his ability to utilize other services offered, substantial evidence supports the trial court's determination that the Department provided services tailored to meet J.S.'s needs.

2

Regarding element (e), J.S. argues that the Department failed to prove by clear, cogent, and convincing evidence "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future," as required by RCW 13.34.180(1)(e). We disagree.

RCW 13.34.180(1)(e) focuses on whether parenting deficiencies have been corrected. *In re Welfare of E.D.,* 195 Wn. App. 673, 689, 381 P.3d 1230 (2016). "What constitutes 'near future' depends on the age of the child and the circumstances of the child's placement." *In re Welfare of C.B.*, 134 Wn. App. 942,

954, 143 P.3d 856 (2006). Here, the trial court found that S.R.K.'s "near future" is "six months or less." Because J.S. does not challenge this finding, a near future of "six months or less" is a verity on appeal. *See Estate of Jones*, 152 Wn.2d at 8.

The trial court found that J.S. could not complete his domestic violence services or "address his complex PTSD" in the six-month time frame. J.S. concedes that he cannot complete his domestic violence services in that timeframe, but challenges the finding as to his ability to address his PTSD. According to J.S., "finishing mental health treatment (or substance abuse or DV treatment) isn't necessarily required in order to get to a safe standard for parenting" and "[t]he record does not reflect that given 6 more months, J.S. couldn't make substantial progress . . . to the point where he could safely parent S.R.K. in an in-home dependency."

But J.S. does not challenge several findings of fact that support the trial court's determination. The court found that J.S. "has not obtained adequate control of his mental health symptoms" and "[a]bsent appropriate treatment for his mental health, [J.S.'s] prognosis for parenting ability is poor." With respect to the anticipated timeline for J.S.'s mental health treatment, the court found that the psychological expert credibly testified "[f]or a person ready and willing to engage in treatment with high motivation, it can take five years to achieve optimal control of PTSD symptoms, with the shortest time being three to four years." Yet, at the time of the trial, J.S. had not engaged in mental health treatment for more than six months and had only just had an introductory session for EMDR. The trial court also found J.S. "does not believe he requires mental health services. He does not

- 8 -

believe he should adhere to any prescription medication recommendations. He believes he is being coerced into seeking care for his mental health concerns." Finally, the court found "[J.S.] has not evidenced high motivation or a commitment to consistently and diligently engage in treatment."

Because J.S. does not challenge the above findings, they are verities on appeal. *See Jones*, 152 Wn.2d at 8. Based on these verities, J.S. requires years-long mental health treatment to successfully parent but continues to deny the need for such treatment. Given the long timeline for treatment, J.S.'s demonstrated lack of motivation to engage in that treatment, and S.R.K.'s near future of "six months or less," the trial court's finding that "[t]here is little likelihood that conditions will be remedied so that the child can be returned to his father within the near future" is supported by substantial evidence.

3

Lastly, regarding element (f), J.S. asserts that the Department failed to prove by clear, cogent, and convincing evidence that guardianship was not an available option for S.R.K. and that termination of his parental rights was necessary for permanency. We disagree.

The issue of guardianship arises under RCW 13.34.180(1)(f) because it requires the Department to prove that continuation of the parent-child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home. To this end, the trial court "must consider the efforts taken by the department to support a guardianship and whether a guardianship is available as a permanent option for the child." RCW 13.34.180(1)(f). "Whether guardianship

is a viable alternative to termination is a case-specific determination, considering factors relevant to the best interests of the child." *In re Dependency of G.C.B.*, 28 Wn. App. 2d 157, 173, 535 P.3d 451 (2023).

Here, the trial court stated that it "considered the efforts taken by the Department to support a guardianship and whether a guardianship is available as a permanent option for the child. Guardianship is not an available plan for the child." J.S. assigns error to this finding and contends that the testimony as to the Department's support of a guardianship was limited and did not demonstrate that the Department affirmatively supported or encouraged guardianship as an option. While we agree with J.S. that the Department provided limited testimony about its efforts toward a guardianship, "the Department need not disprove the availability of a guardianship placement to satisfy its burden under RCW 13.34.180(1)(f)." *Id*. Rather, the trial court must "consider the viability of guardianship as a factor when assessing whether the Department has shown that 'continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.'" *Id.* (quoting RCW 13.34.180(1)(f)).

The above requirements are satisfied here. The trial court heard testimony from the Department social worker who attended a permanency consultation meeting with the caregivers during which a Department staff member discussed "the differences between adoption and guardianship and answer[ed] any and all questions that they may have." The social worker testified that after providing this information, the Department did not have anyone willing to enter into a guardianship rather than adopt S.R.K. The court appointed special advocate also

testified that the caregivers did not intend to offer a guardianship to either parent. This evidence supports the trial court's finding that a guardianship was not a viable option for S.R.K.

Moreover, the trial court considers the issue of guardianship within the context of the impact of parental rights on the child's integration into a permanent home. RCW 13.34.180(1)(f). Several unchallenged findings of fact establish the harm of continuing the parent-child relationship between S.R.K. and J.S. The court found that "[t]he need for stability for this particular child is great" and that "[J.S.] has demonstrated that he cannot maintain placement of [S.R.K.] in his care. He has had two opportunities to do so but failed to exceed seven months of independent parenting. Each placement change is a disruption to [S.R.K.] which detrimentally impacts him."

Further, the trial court found, "[w]hile [J.S.] retains parental rights, [S.R.K.] cannot be adopted into his caregivers' home, subjecting him to continued dependency proceedings." The evidence shows that S.R.K. is adoptable and is in a relative placement and pre-adoptive home with his half-brother who is in the process of being adopted. A Department social worker testified that continuing J.S.'s parental rights clearly diminished S.R.K.'s prospects for early integration. With parental rights intact, S.R.K. "can't achieve permanency and be adopted and get that stability that he needs." In short, the trial court properly found that the Department did not have a willing guardian and that continuation of J.S.'s parental rights diminished S.R.K.'s prospects for early integration into a stable home.

B

Turning to the second step of the termination analysis, J.S. argues the Department failed to prove by a preponderance of the evidence that termination was in S.R.K.'s best interests. We disagree.

J.S. challenges several of the findings of fact that support the trial court's conclusion that termination is in S.R.K.'s best interests. But J.S. again fails to challenge a significant finding of fact that provides the necessary support for the trial court's determination. The court found:

> The physical violence and emotional/psychological harm due to verbal abuse and exposure to domestic violence and angry behavior, perpetrated by [J.S.] to [S.R.K.] outweigh any harm associated with diminished contact with the father or break in bond with the father. The physical violence and emotional/psychological harm to this child support finding termination is in [S.R.K.'s] best interest.

J.S. does not refute this finding, nor does he attempt to negate its implications for the best interests analysis. This unchallenged finding shows, and the record confirms, that the trial court properly determined that termination of J.S.'s parental rights was in S.R.K.'s best interests regardless of their positive relationship.

Affirmed.

Feldman, J.

WE CONCUR:

Díaz, J.

Chung, J.

- 12 -