# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | No. 78350-5-I consolidated with |
| | ) | No. 78351-3-I |
| N.P., | ) | |
| DOB: 02/28/2013, | ) | |
| | ) | |
| Minor Child. | ) | |
| | ) | |
| STATE OF WASHINGTON | ) | UNPUBLISHED OPINION |
| DEPARTMENT OF SOCIAL AND | ) | |
| HEALTH SERVICES, | ) | |
| | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | FILED: July 8, 2019 |
| KATE DANIELS, | ) | |
| | ) | |
| Appellant. | ) | |

MANN, A.C.J. — Kate Daniels appeals the trial court's order granting the Washington Department of Social and Health Services's petition to terminate her parental rights to N.P. Because the Department demonstrated that it provided Kate Daniels with all reasonably necessary services capable of correcting her parental deficiencies, that Daniels was currently unfit to parent N.P., and that it was unlikely that N.P. could be returned to Daniels's care in the near future, we affirm.

I.

Daniels is the biological mother of N.P. who was born in 2013. When Daniels was pregnant with N.P., she was diagnosed with Huntington's disease. Huntington's disease is a degenerative and debilitating disease with symptoms including loss of mobility, reduced cognition, delusions, and paranoia. While the psychiatric symptoms are potentially treatable through medicine, there are no remedies for the other symptoms. Huntington's disease is 100 percent fatal. Daniels began treatment at the University of Washington Huntington's Disease Clinic (UW clinic) in 2013.

In 2014, Daniels had her second child, M.K.P. Daniel's medical team reported that she was having challenges caring for both children. The Department filed dependency petitions as to both children. Daniels agreed that her executive functioning and physical functioning were negatively impacted by Huntington's disease. M.K.P. was placed in foster care. Daniels relinquished her parental rights to M.K.P. in 2016.

In the 2014 dependency, N.P. was placed in the care of Daniels on the condition that she lived with her parents. Daniels was ordered to participate in a neuropsychological evaluation and follow recommendations, a parenting assessment and follow recommendations, and an in-home support service. Dr. Paul Connor conducted a neuropsychological evaluation of Daniels. Daniels's testing "showed slow processing speed, impaired response time, and her learning recall was severely impaired." Further, she "demonstrated persisting attentional difficulties, and impaired ability to react quickly to address situations." Dr. Steve Tutty also conducted a comprehensive parenting evaluation of Daniels. Dr. Tutty reported that Daniels had a "dependent attitude towards life . . . that she significantly underestimated her true

psychological challenges . . . [and] she had difficulty processing and responding to the demands of [N.P.]." Dr. Tutty reported that Daniels did not engage, guide, or set boundaries with N.P. and that lack of insight is often associated with Huntington's disease.

Daniels divorced N.P.'s father and remained living with her parents.[1] The Department dismissed the dependency in October 2015. In February 2016, Daniels began to exhibit signs of paranoia and became episodically delusional. Daniels believed her former nurse at the UW clinic had conspired with her parents in an attempt to murder her. She believed that bugs were crawling all over her skin and out of her mouth. She also accused her parents and other adult family members of sexually assaulting N.P. Daniels reported her concerns to the police and fled her parents' home with N.P. Daniels's parents decided that she could no longer live in their home.

Daniels began residing in shelters with N.P. The Department developed a detailed safety plan for N.P. to remain in Daniels's care. Daniels followed the safety plan for several days but then stopped staying in shelters. On March 14, 2016, the Department filed a second dependency petition. The trial court placed N.P. in Daniels's care under a shelter care order. The order required that Daniels regularly participate at the UW clinic, that N.P. "shall not be left unattended at any time while in [Daniels's] care," and that Daniels must keep in regular contact with the Department. The UW clinic was able to provide Daniels with housing resources, assistance with social security income, mental health services, nutritional services, and medication management. The UW clinic was also able to provide medication for psychiatric

---

[1] N.P.'s father, Fauniteni Pauni's parental rights were terminated by default and are not at issue in this appeal.

symptoms. The registered nurse that worked with Daniels testified that medications were "offered and offered" to Daniels, but that she did not want to take them.

The Department arranged for mental health counselor J. Chalice Bailey to work with Daniels beginning in May 2016. In May 2016, Daniels was living at a shelter named Mary's Place. Bailey provided Daniels with intensive family preservation services, a type of in-home service designed to maintain a child safely in the child's current placement. Bailey came to Daniels in the shelter and worked with her on her organizational skills and the ability to follow through on tasks. Daniels had a voice mail box that was full and a stack of unopened mail. She did not realize that the she had $10,000 worth of back payment for social security benefits that needed to be collected.

Bailey also helped Daniels apply for COPES,[2] a program that provides disabled individuals with intensive in-home care such as getting groceries, cooking, cleaning, and transportation. Daniels did not follow through with her COPES appointments.

Social worker Rob Credle was driving Daniels and N.P. to and from the overnight Mary's Place shelter in Seattle to the Mary's Place day center in Shoreline. Credle did this three to five times a week. Credle also provided Daniels with an ORCA card to assist with their transportation needs.

In June 2016, Daniels stopped contacting Credle and the UW clinic social workers. The Department was unable to locate Daniels. As a result, the trial court ordered that N.P. be removed from Daniels's care and be placed with Daniels's parents. The court also ordered a writ of habeas corpus and a warrant in aid of the writ of habeas corpus to help locate Daniels and N.P. Daniels did not appear for her five-day

[2] Community Options Program Entry System.

contested dependency trial in July 2016. On July 26, 2016, N.P. was then declared dependent, based on Daniels's inability to "adequately [care] for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." RCW 13.34.030(6)(d). The trial court ordered Daniels to participate in an updated neuropsychological evaluation with a parenting component and to comply with the treatment recommendations of her medical provider.

Daniels and N.P. were eventually located in Texas. Daniels's parents flew to Texas to retrieve N.P. and bring him back to Washington. N.P. has remained in his grandparents' care ever since. Daniels returned to Washington from Texas in September 2016. Brenda Vicars and a social worker from the UW clinic met with Daniels in October 2016 to arrange resources for her. Because of Daniels's history with refusing antipsychotic medication, they suggested an antidepressant medication. Daniels refused the antidepressant medication as well.

As part of the second dependency order, Daniels was required to complete an updated neuropsychological evaluation with a parenting component and follow through with treatment recommendations, take her medication as prescribed by her Huntington's disease provider, attend her medical appointments, check-in weekly with the UW clinic social worker, and follow the nutritional plan recommended by her Huntington's disease provider. Daniels was allowed to visit N.P. for a minimum of 10 hours of supervised visits per week.

While Daniels did complete an updated neuropsychological evaluation with Dr. Marnee Milner, she failed to complete the parenting component due to missed appointments and scheduling errors. Daniels also regularly refused to take her

prescribed medication. Further, Daniels came to believe that the UW clinic staff were working with her parents to try and kill her. As a result, Daniels stopped attending her medical appointments or checking in with the UW clinic social worker. Daniels's visits with N.P. were also reduced to two, two hour visits per week based on Daniels's failure to show up for scheduled visits.

The Department filed a petition for termination on September 22, 2017. The petition alleged that Daniels was unfit to parent N.P. because she had not demonstrated the capacity to provide "for the child's emotional, physical, mental, and developmental needs." Daniels denied the allegation.

The trial court held a contested termination hearing in February and March 2018. The Department called six witnesses: Catherine Hatch-Daniels (Daniels's mother), Brenda Vicars, Kate Daniels, J. Chalice Bailey, Robert Credle, and Dr. Milner. The Court Appointed Special Advocate (CASA), Lee McKoin, also testified in support of the Department's case. Daniels's case largely revolved around the theory that the Department failed to provide her with necessary services and failed to reasonably accommodate her disability as required by the ADA.

The trial court concluded that the Department had met its statutory burden of proof and granted the Department's petition. Daniels appeals.

II.

For the trial court to grant a termination petition, the Department must satisfy a two-step process. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). First, the Department must prove "[t]he allegations contained in the petition [for termination] as provided in RCW 13.34.180(1) are established by clear, cogent, and

convincing evidence." RCW 13.34.190(1). As relevant to this appeal, the Department

must prove:

> (d) That the services ordered . . . have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided; [and]
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future. . . . In determining whether the conditions will be remedied the court may consider, but is not limited to, the following factors . . .
> (ii) . . . documented unwillingness of the parent to receive and complete treatment or documentation that there is no treatment that can render the parent capable of providing proper care for the child in the near future; . . .

RCW 13.34.180(1).[3] Then, if the trial court finds that the Department has met its burden

of proof under RCW 13.34.180(1), the court must determine by a preponderance of the

evidence that termination is in the best interest of the child before granting the petition.

RCW 13.34.190(1)(b).

"Clear, cogent, and convincing evidence exists when the ultimate fact in issue is

shown by the evidence to be highly probable." In re Dependency of K.R., 128 Wn.2d

129, 141, 904 P.2d 1132 (1995) (internal citation removed). When "the proof required is

clear and convincing, 'the question on appeal is whether there is substantial evidence to

support the findings in light of the highly probable test.'" In re Dependency of A.M.M.,

---

[3] The Department must also prove:
(a) That the child has been found to be a dependent child;
(b) That the court has entered a dispositional order . . .;
(c) That the child has been removed . . . from the custody of the parent for a period of at least six months . . .; [and]
(f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). Daniels does not argue that the Department failed to satisfy its burden under RCW 13.34.180(1)(a)-(c) and (f).

182 Wn. App. 776, 786, 332 P.3d 500 (2014) (quoting In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159 (1990)).

III.

Daniels argues first that there is insufficient evidence in the record to show that the Department provided her with all reasonably necessary services. RCW 13.34.180(1)(d). We disagree.

When considering whether the Department provided all necessary services under RCW 13.34.180(1)(d), the court may consider any services that the parent receives, regardless of the source. In re Dependency of D.A., 124 Wn. App. 644, 651-52, 102 P.3d 846 (2004). A necessary service is a service "needed to address a condition that precludes reunification of the parent and child." In re Matter of K.M.M., 186 Wn.2d 466, 480, 379 P.3d 75 (2016). But "[w]hen a parent is unwilling or unable to make use of the services provided, [the Department] is not required to offer still other services that might have been helpful." In re Dependency of T.R., 108 Wn. App. 149, 163, 29 P.3d 1275 (2001).[4]

A.

Daniels argues that the Department failed to provide housing services but the record indicates otherwise. Credle testified as to his efforts in trying to find suitable housing. Credle testified that he "referred [Daniels] to homebuilders, and they were working on that, creating a list, helping her complete applications." He also researched housing options that would be able to both support a person with Huntington's disease

---

[4] See also In re Dependency of Ramquist, 52 Wn. App. 854, 861, 765 P.2d 30 (1988) ("[A] parent's unwillingness or inability to make use of the services provided excuses the state from offering extra services that might have been helpful.").

and allow them to live with their child, but was unable to find any suitable options. He explained, "I did contact the New York main office [of Huntington's Disease Clinics] to talk about any residential services where Ms. Daniels and [N.P.] could live together and have someone help support [N.P.], and they responded no, there isn't anything like that." Credle also explained that he was unable to obtain Daniels a housing voucher because they are very limited and she did not qualify.

Further, Daniels received additional support from Bailey and Vicars. Bailey "worked extensively with [Daniels] on finding housing." But because Daniels fled the shelter where Bailey was helping her, and refused to continue working with the UW clinic, these efforts were ultimately unsuccessful.

Therefore, there is substantial evidence in light of the highly probable test to support the trial court's conclusion that the Department provided Daniels with necessary services for her to obtain suitable housing. Daniels's refusal to cooperate with the Department by fleeing the shelter and by failing to work with the UW clinic indicates that the Department did all that was required of it in attempting to find Daniels housing.

B.

Daniels also argues that the Department failed to provide her with an alternative treatment provider for her Huntington's disease when she decided to stop attending the UW clinic. But the record indicates that the Department tried to assist Daniels in finding an alternative treatment provider but determined that doing so was unreasonable.

Credle testified that he attempted to find an alternative provider for Daniels but decided that doing so would be inappropriate because the UW clinic was the only clinic in the area that was specifically trained to accommodate a patient with Huntington's

disease. Because Daniels's main parental deficiency was Huntington's disease, Credle did not make "any referrals to any agency that wasn't familiar with" the disease.[5]

Credle testified that he checked for services for Huntington's disease patients throughout the nation but was unable to find any at the same quality as the UW clinic. He asked Daniels if she had another provider in mind and informed her that "there were no other . . . providers within Washington State that had that level of expertise [as the UW clinic]." Credle encouraged Daniels to return to the UW clinic but Daniels refused.

Therefore, substantial evidence supports the trial court's conclusion that the Department provided Daniels with necessary services for her to obtain an appropriate treatment provider.

C.

Daniels argues that the Department failed to provide services to address N.P.'s emotions and to teach him about his mother's disability. The records supports the opposite conclusion. N.P. is currently in counseling to learn how to deal with his mother's disability. While there was never any counseling specifically offered to both Daniels and N.P. together, such a service would have been available through the UW clinic but Daniels refused to attend.[6]

---

[5] Daniels's argument here also appears contrary to her later argument about the Americans with Disabilities Act (ADA). Daniels argues that under the ADA the Department was required to, but did not, specifically tailor her services to her disability but then chides the Department for not finding her an alternative treatment provider when the only treatment provider available specifically trained to deal with her disability was the UW clinic.

[6] Credle testified: "I referred her to the [UW clinic]. They have specific knowledge of how to interact with their patients that have Huntington's Disease and their family relationships with that . . . . I looked for the best possible people that could do that, the best service that could provide that type of service and made active efforts to get her connected with the [UW clinic]."

D.

Daniels argues that the Department failed to obtain an in-home service provider to assist Daniels in the care of N.P. Again, the record supports the opposite conclusion. The Department provided Daniels with 57.5 hours of extensive in-home care when she was living in the shelter, through the assistance of Bailey and the Homebuilders Program. Bailey also helped arrange for the shelter's staff to check in with Daniels to make sure she was adequately providing for N.P.'s needs. Further, Bailey helped Daniels apply for the COPES program, which would have provided even more intensive in-home care for Daniels. But Daniels did not follow through on any of her COPES appointments, and stopped working with Bailey upon fleeing to Texas.

At oral argument, Daniels asserted that the Department had an on-going duty to continue trying to provide her with in-home care. She argues that the efforts the Department made while the second dependency was pending does not count as providing her with necessary services since those efforts were made before N.P. was declared dependent the second time. Daniels cites no authority for the proposition that once a child is found dependent all of the Department's prior efforts to assist the parent are erased from the record. And further, the trial court found Credle's testimony that he continued to search for services that could help Daniels credible. As such, the record indicates that the Department continued to try and provide Daniels with support including in-home care, but that those efforts were ultimately unsuccessful.

Relatedly, Daniels argues that the Department should have allowed her to parent N.P. interdependently because "parenting is frequently a group effort" and the requirement that parents be able to do it alone is misplaced. But the records shows that

-11-

the Department was willing to let Daniels parent N.P. with support. The first dependency petition was dismissed because Daniels was successfully caring for N.P. with the help of her parents. But Daniels fled her parents' house. The court then allowed N.P. to remain with Daniels under the shelter care order because Daniels had assistance caring for N.P. But Daniels fled again. Therefore, there is no evidence in the record showing that Daniels is able to either find an environment where she can parent interdependently or remain in such an environment if one did exist.

IV.

The trial court found that Daniels has "a federally recognized disability and the services offered were tailored to that disability." Daniels argued that the Department violated the Americans with Disabilities Act (ADA). We disagree.

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any entity." 42 U.S.C. § 12132.[7] It is undisputed that Daniels is a qualified individual and the Department is a public entity. Therefore, the Department, in offering Daniels services, must make "reasonable accommodations to allow [Daniels] to receive the services or to participate in the public entity's programs." In re Welfare of A.J.R., 78 Wn. App. 222, 230, 896 P.2d 1298 (1995). The Department need not, however, offer services to disabled persons that it does not offer to others. See In re Welfare of H.S.,

---

[7] Similarly, the Rehabilitation Act provides that a qualified disabled person shall not "solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

94 Wn. App. 511, 973 P.2d 474, cert denied sub nom, Swensen v. Dep't of Soc. & Health Servs., 529 U.S. 1108 (2000).

Daniels argues that the Department failed to provide her with reasonable accommodations. She asserts that the Department was required to accommodate her disability and modify its service plan so that she could address her parental deficiencies.[8]

The record shows that the Department reasonably accommodated Daniels's disability. The Department provided Daniels with three different neuropsychological evaluations and met with her to discuss the results. Based on the results of the first evaluations, the Department offered Daniels parenting classes. Further, Credle testified that he extensively researched service providers capable of addressing Daniels's Huntington's disease and discovered that the UW clinic was the only option to help Daniels overcome her parental deficiencies. And the Department attempted to let Daniels and N.P. live, first, with Daniels's parents and then under a shelter care order until it became too risky to N.P.'s safety to allow such an arrangement.

In I.M.-M., Division Three reversed a termination order after finding that the Department failed to properly tailor services to the parent's disabilities. In the Matter of I.M.-M., 196 Wn. App. 914, 917, 385 P.3d 268 (2016). The court reasoned that "[n]one of [the parent's] service providers testified they were trained to work with cognitively disabled persons . . . [and they did not] deploy[] techniques specific to [the parent's] impairment." I.M.-M., 196 Wn. App. at 922.

---

[8] But see In re Welfare of Angelo H., 124 Wn. App. 578, 587, 102 P.3d 822 (2004) (the ADA "does not require [the Department] to provide disabled parents with services not offered to other parents in dependency proceedings.").

I.M.-M. is easily distinguishable from this case. There, the Department determined that the parent was severely developmentally disabled but failed to inform the parent's service providers of this disability and the service providers did not tailor their services to address the disability. I.M.-M., 196 Wn. App. at 918-19, 922. Here, however, the opposite is true. Because Daniels's primary parental deficiency was her Huntington's disease, Credle only sought out service providers who were specifically trained to deal with Huntington's disease.

Therefore, there is substantial evidence in the record, even in light of the highly probable standard, to support the trial court's determination that the Department reasonably accommodated Daniels's disability.

V.

Daniels next contends that the Department failed to prove either that she is currently unfit to parent N.P. or that there is little likelihood that her parental deficiencies will be remedied so that N.P. can be returned to her in the near future. See A.B., 168 Wn.2d at 920. RCW 13.34.180(1)(e). We disagree.

A.

To prove current unfitness, "the State must show that the parent's deficiencies make him or her incapable of providing basic nurture, health, or safety." In re Matter of B.P., 186 Wn.2d 292, 313, 376 P.3d 350 (2016) (internal citations removed). Below, the trial court concluded that Daniels "does not have the capacity to provide the appropriate responsiveness or attention necessary to parent [N.P.], placing [him] at great risk in her care." Daniels argues that this finding was in error because it was largely based off of speculation and stereotypes that people with disabilities would be unable to respond

quickly in the event of an emergency. But there is substantial evidence in the record to support the trial court's conclusion that Daniels is currently unfit to parent N.P.

Everyone who testified agreed that Daniels was unable to safely parent N.P. Daniels herself admitted that she is only able to care for N.P. on most days. She explained, "I think <u>most</u> days I am still able to do <u>most</u> of the things it requires to care for him."[9] And when asked why termination was not in N.P.'s best interest, Daniels was unable to come up with a sufficient answer.

Hatch-Daniels testified about Daniels's reduced motor and cognitive skills: "The use of her hands has diminished . . . she sometimes—many times had trouble sleeping during appropriate times." "She has a lot of trouble making a decision about something. She is very slow in responding." And Hatch-Daniels agreed that she had a lot of concerns about Daniels's ability to parent N.P.

Vicars had concerns about Daniels being able to meet N.P.'s basic needs based on her lack of "stable housing, stable food-gathering, being able to do the daily needs of having a baby." Vicars also believed that Daniels's psychological symptoms including mood swings and angry behaviors would negatively impact her ability to care for N.P.

Then, Bailey testified that Daniels was only able to provide for N.P. when she had help doing so, which is why Bailey attempted to set Daniels up with COPES, but Daniels did not follow through.

Credle agreed. He testified about how Daniels would sometimes become unresponsive when she was visiting with N.P. "[I]t can best be described as a catatonic state . . . she was standing in the visitation room swaying . . . with her eyes partially

---

[9] (Emphasis added.)

-15-

closed and not watching [N.P.]." He was concerned that Daniels would be unable to respond if a dangerous situation arose because she was unable to keep up with N.P. Further, Credle observed a visitation where Daniels became unresponsive and N.P. began running towards the street. Credle had to run out and grab him because Daniels was unable to do so.

Dr. Milner concluded that Daniels's "deficits in learning new information, sustained and divided attention, motor coordination, speed of processing, language naming and fluency . . . would likely impede her ability to physically and cognitively keep up with [N.P.]." Daniels also "demonstrated poor judgment [and] bouts of psychotic features," which indicate that Daniels would have trouble parenting N.P. safely.

The CASA, Lee McKoin, had concerns over N.P.'s safety with Daniels and did not believe that Daniels was able to provide adequate care for N.P. The CASA explained that it would be very hard for N.P. to determine when and if his mother's delusions were real and when and if he should contact someone for help. "It would be up to [N.P.] to decide when he needs to call someone for help or call 911." Further, "if his mother [is] having a hard time waking up or he couldn't get her attention [he would have to determine] if there was an emergency or if he was hungry or needed to go to school" he would have to deal with that himself.[10] Further, the CASA explained that Daniels would come "back from visits with [N.P.] . . . extremely exhausted" which caused concern because the visits only lasted a few hours, but if N.P. was returned to her Daniels would have to parent all day.

---

[10] The CASA described reports of Daniels leaving the stove or shower on for hours.

The trial court concluded that based on her limited mobility, reduced reaction speed, bouts of unresponsiveness, paranoia, and delusions, Daniels was currently unfit to parent N.P. Based on all of the evidence established below, there is substantial evidence to support the trial court's conclusion.

B.

RCW 13.34.180(1)(e) also requires the Department prove "[t]hat there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future." "A determination of what constitutes the near future depends on the age of the child and the circumstances of the placement." In re Dependency of T.L.G., 126 Wn. App. 181, 204, 108 P.3d 156 (2005).

Daniels asserts that the trial court "assume[d] too much" in finding that the Department met its burden under RCW 13.34.180(1)(e), because "with the right supports or safety plan, [Daniels] can parent her son." But even when supported by other people and under the guidance of a proper safety plan, Daniels has been unable to safely parent N.P. Daniels's delusions caused her to flee the safe environment that was her parents' house and the relative safety of the shelter, and prevented her from engaging in necessary services at the UW clinic. All three of which contained dedicated individuals who were ready and able to help Daniels care for N.P.

Therefore, the record indicates that even when supported by an appropriate safety plan Daniels was unable to safely parent N.P. As such, substantial evidence supports the trial court's conclusions that there is little likelihood that conditions will be remedied in the near future so that N.P. can be returned to Daniels's care.[11]

---

[11] Daniels did not offer any argument about whether the trial court properly concluded that continuation of the parent-child relationship diminished the child's prospect for early integration into a

VI.

For the first time on appeal, Daniels asserts that the Department violated her due process right by failing to notify her "that [N.P.] sometimes experienced negative reactions during visits and that this hindered [N.P.'s] psychological development."

This court may refuse to review any claim of error not raised below. State v. O'Hara, 167 Wn.2d 91, 97-98, 217 P.3d 756 (2009) (internal citation omitted). One exception to the general rule is a "manifest error affecting a constitutional right." RAP 2.5(a)(3). For RAP 2.5(a)(3) to apply, the appellant must demonstrate both (1) an error of constitutional magnitude and (2) the error is manifest. "'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice." State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). "To demonstrate actual prejudice, there must be a 'plausible showing by the [appellant] that the asserted error had practical and identifiable consequences in the trial of the case.'" O'Hara, 167 Wn.2d at 99 (quoting Kirkman, 159 Wn.2d at 935).

For the first time in her reply brief,[12] Daniels argues that this error was manifest because it had "practical and identifiable consequences" since "many of the court's findings were based on the due process violation." But the majority of the trial court's findings of fact made no mention of N.P.'s negative reactions to parental visits. And even without the specific findings of fact that do mention N.P.'s negative reactions, there is still sufficient evidence to support the trial court's conclusion that the State met its

---

stable and permanent home or that termination is in the child's best interest. See State v. O'Neill, 148 Wn.2d 564, 571, 62 P.3d 489 (2003) (Unchallenged findings of fact are verities on appeal); Brown v. Vail, 169 Wn.2d 318, 336 n.11, 237 P.3d 263 (2010) ("A party that offers no argument in its opening brief on a claimed assignment of error waives the assignment.").

[12] But see Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) ("An issue raised and argued for the first time in a reply brief is too late to warrant consideration.").

statutory burden to show that termination was warranted. Therefore, Daniels has failed to show how her alleged error is manifest.

But even if we were to review Daniels's due process allegation, there is no merit in her claim. Daniels has been aware from the beginning of this process that both N.P.'s emotional and physical needs were at issue.

The initial dependency indicated that Daniels was unable to adequately care for N.P. "such that the child is in circumstances which constitutes a danger of substantial damage to the child's psychological or physical development." The termination petition alleged Daniels was unable to care for N.P.'s "emotional, physical, mental, and developmental needs[,]" and that "the parents are incapable of providing for their child's emotional, physical, mental, and developmental needs." And Daniels's answer to the petition confirmed that N.P. has a right to be raised "under the care and custody of emotionally stable, nurturing parents."

Therefore, since the Department filed the first dependency petition in this matter, Daniels has been on notice that part of the Department's concerns was N.P.'s emotional well-being. This was sufficient to put her on notice that N.P.'s emotional and psychological reactions could come up during trial. As such, the court did not violate Daniels's due process rights by mentioning in its findings of fact that N.P. occasionally has negative reactions after parental visits.

We affirm.

Mann, A.C.J.

WE CONCUR:

Leach, J.

Dwyer, J.