IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| In the Matter of the Dependency of: | ) | No. 82044-3-I |
| | ) | |
| G.L.L. | ) | DIVISION ONE |
| | ) | |
| Minor Child. | ) | PUBLISHED IN PART |
| | ) | |
| | ) | |

HAZELRIGG, J. — B.L. appeals from a Snohomish County Juvenile Court order terminating her parental rights as to her daughter, G.L.L. She asserts that (1) she received inadequate notice that the Department of Children Youth and Families (Department) sought termination based in part on her deficient parenting skills, (2) substantial evidence does not support the finding that the Department offered her all necessary services because it did not offer her housing services, (3) substantial evidence does not support a finding of a mental-health-related deficiency, (4) her due process rights were violated when the court held the hearing via Zoom, and (5) several findings of fact are not supported by sufficient evidence. Because B.L.'s due process rights were not violated, she received adequate notice of the various bases for the termination, and substantial evidence supports the trial court's findings of facts, we affirm.

FACTS

In December 2018, the Department of Children, Youth, and Families filed a dependency petition for G.L.L. It was the second dependency the Department had filed as to this child and the mother, B.L. Dependency was established in March 2019 after the court accepted B.L.'s stipulation to that fact, and the Department filed for termination of B.L.'s parental rights in January 2020. The Department alleged in its petition that B.L.'s deficiencies included "mental health issues, chronic substance abuse issues, lack of parenting skills, and lack of safe and stable housing." In September 2020, the juvenile court held a fact-finding hearing and terminated B.L.'s parental rights. B.L. appeals.

ANALYSIS

I.   Due Process Claim

B.L. argues her due process rights were violated when her termination fact-finding hearing was held via Zoom[1] due to COVID-19[2] restrictions in effect at the court. She argues because every witness (except B.L. herself) testified over Zoom, the court's ability to make credibility determinations was impeded and the proceedings were impacted by risk of error due to "Zoom fatigue."[3] The Department concedes that B.L. has a fundamental interest in the care and custody of her child, and that G.L.L. shares this interest until the Department proves

---

[1] "Zoom" is a cloud-based peer-to-peer video conferencing software platform that is used for teleconferencing, telecommuting, distance education, and social relations.
[2] Novel Coronavirus-19.
[3] Exhaustion from peer-to-peer video conferencing. See Liz Fosslien & Mollie West Duffy, How to Combat Zoom Fatigue, Harvard Bus. Review (Apr. 29, 2020, 5:00 PM), https://hbr.org/2020/04/how-to-combat-zoom-fatigue.

parental unfitness. However, the Department argues the hearing had sufficient procedural safeguards because B.L. was physically present in the courtroom alongside her attorney, the proceeding was relatively short, and the trial court was able to properly make credibility determinations.

Alleged due process violations are reviewed de novo. In re the Dependency of W.W.S., 14 Wn. App. 2d 342, 353, 469 P.3d 1190 (2020). A parent's due process rights in a termination proceeding "ordinarily include[] the right to be present," but a hearing may still comport with due process if the parent is not physically present but is still "given a meaningful opportunity to be heard and defend through alternative procedures." In re Welfare of M.B., 195 Wn.2d 859, 868, 467 P.3d 969 (2020). This court applies the Mathews v. Eldridge test to determine whether a violation of due process has occurred. 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 218 (1976). This test balances: (1) the private interests affected, (2) the State's interest in using the challenged procedures, and (3) the risk of erroneous deprivation due to the procedures used. In re Welfare of D.E., 196 Wn.2d 92, 102, 469 P.3d 1163 (2020).

This court recently held that a termination hearing conducted via Zoom did not violate a parent's right to a meaningful opportunity to be heard. In re Dependency of J.D.E.C., No. 81795-7-I (Wash. Ct. App. July 19, 2021) (unpublished) https://www.courts.wa.gov/opinions/pdf/817957.pdf. However, in J.D.E.C., the trial court "weighed the Mathews factors at the outset of trial,"[4] while the court in B.L.'s case stated only "I believe that the processes that we have in

---

[4] Id. at 11.

place protect the parties due process rights, and we are able to manage the appearance of parties via Zoom."[5]  When B.L. made her objection just before trial began, the juvenile court again neglected to expressly conduct the Mathews balancing test on the record, instead stating "I am not seeing good cause or really a sufficient reason being put forward to revisit the denial of the motion."

As trial courts continue to hold proceedings virtually, judges should conduct the Mathews analysis on the record to ensure the proceeding comports with due process and to provide a sufficient record on appeal.

However, the specific due process challenge raised here differs from that raised in J.D.E.C.  B.L. does not claim, as the father in J.D.E.C. did, that use of a remote platform to conduct the proceeding impacted her ability to meaningfully participate or communicate with counsel.  In fact, the record before us indicates that the judge expressly made accommodations, consistent with the court's COVID-19 plan and procedures, so that the mother could be present in court with her counsel throughout the termination hearing.  B.L. claims that she, her attorney, and the court were unable to properly make credibility determinations as to the various witnesses based on their remote testimony.  However, the court did, in fact, make credibility determinations at the conclusion of the proceedings.  B.L. fails to engage with them in her briefing to explain which of these determinations were erroneous, or specifically how they may have been impaired by the Zoom testimony.

---

[5] One judge heard B.L.'s initial objection to a virtual proceeding, and a second considered her renewed objection at the beginning of the termination hearing.

Like the father in J.D.E.C., B.L. was afforded the opportunity to have the judge evaluate her credibility in person. B.L.'s attorney was also physically present in the courtroom. While all other witnesses were required to appear via Zoom, B.L. was able to view each witness' testimony from the courtroom. B.L. was in person for the entirety of the fact-finding hearing and was able to consult with her attorney in person, unlike the father in J.D.E.C., who appeared telephonically and had to request a breakout room to consult with his attorney privately. See Id. at 9.

Nothing in the hearing transcript suggests that there were connectivity issues or that the parties expressed difficulty observing the witnesses or hearing the court. Further, the record demonstrates that the court took regularly scheduled breaks, which is one of the recommended strategies to mitigate "Zoom fatigue." While B.L. argues that one of the ways her due process rights were violated by the remote testimony was that she and her counsel may have asked different questions on cross-examination, she fails to provide even a single example of a question she would have posed or how her examination would have otherwise differed had the witnesses testified in person. Finally, it is worth considering in the context of this particular challenge that credibility determinations are based on more than visual cues, which is at least part of the reasoning behind CR 43(a)(1) which expressly allows for "testimony in open court by contemporaneous transmission from a different location."

This court has held that "[t]he trial court is in a better position to make credibility determinations, and if substantial evidence exists, this court will not substitute its judgment for that of the trial court on appeal." Currier v. Northland

Servs., Inc., 182 Wn. App. 733, 741, 332 P.3d 1006 (2014). Without anything to indicate errors in the judge's credibility determinations, B.L. has failed to demonstrate prejudice. However, we remind counsel and the court of the duty to note issues for the record when they arise as courts continue to hold virtual hearings.

II.      All Necessary Services

B.L. alleges the trial court erred in finding she was offered all necessary services under RCW 13.34.180(1)(d), because the Department failed to offer her housing services.

We review a trial court's decision to terminate parental rights for substantial evidence. In re D.H., 195 Wn.2d 710, 718, 464 P.3d 215 (2020). "The trial court's findings will not be disturbed unless there is an absence of clear, cogent, and convincing evidence in the record." Id. In a termination proceeding, the Department must establish "the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence." Id.

A.      Whether Housing is a Necessary Service

Under RCW 13.34.180(1)(d), the Department must demonstrate it provided all necessary and court-ordered services. Id. B.L. does not allege housing was a court-ordered service, but rather argues that it is a "necessary service." "The inquiry is not limited to services ordered by the court," but whether the Department "offered all necessary available services." In re I.M.-M., 196 Wn. App. 914, 921, 385 P.3d 268 (2016). A necessary service is one "'needed to address a condition

that precludes reunification of the parent and child.'" D.H., 195 Wn.2d at 719 (internal quotation marks omitted) (quoting In re K.M.M., 186 Wn.2d 466, 480, 379 P.3d 75 (2016)). "'[W]hen a "condition" precludes reunion of a parent and child [] regardless of whether it can be labeled a "parental deficiency", the State must provide any necessary services to address that condition.'" K.M.M., 186 Wn.2d at 479 (quoting In re Welfare of C.S., 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010)).

In Washington State Coalition for the Homeless v. Department of Social and Health Services, the Washington State Supreme Court held the trial court in a dependency proceeding could order the Department[6] to provide housing assistance in cases where "homelessness is a primary factor in the decision to place or keep a child in foster care." 133 Wn.2d 894, 901, 949 P.2d 1291 (1997). The Court was explicit that assistance was limited to cases "where lack of adequate housing is the primary factor in the out-of-home placement." Id. at 925. Several courts, including this court, have relied on this case in unpublished opinions to hold housing is not a necessary service for purposes of determining if the Department has offered all necessary services in a termination proceeding.[7] We disagree.

First, we note that unpublished opinions of this court may be accorded persuasive value, but are not binding upon this court. GR 14.1(a). Second, Coalition for the Homeless is distinguishable. There is a difference between a trial

_____

[6] In July 2018, the Department of Social and Health Services (DSHS) transferred child welfare responsibilities to the Department of Children, Youth and Families. RCW 43.216.906

[7] See In re Dependency of Z.M.Y., No. 37674-5-III, (Wash. Ct. App. June 15, 2021) (unpublished), https://wwww.courts.wa.gov/opinions/pdf/376745.pdf; In re Dependency of M.–K.G.P., No. 76202-8-I (Wash. Ct. App. Jan. 16, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/762028.pdf.

court's authority to order the Department to provide services during a dependency, and the trial court's authority to decide whether the Department has provided all necessary services as a prerequisite to terminating a parent's rights. Coalition for the Homeless dealt explicitly with a trial court's authority to order services during a dependency, which is not the case here. It seems nonsensical that the Department could rely on lack of housing as a parental deficiency to terminate a parent-child relationship without ever providing housing services.[8]

We disagree with the Department that housing was not a necessary service because it was not identified as a "primary factor" preventing reunification of G.L.L. and B.L. in review hearings. Lack of safe and stable housing was explicitly identified as a parenting deficiency in the termination petition. As such, it certainly could have precluded reunification. This makes it a necessary service. See K.M.M., 186 Wn.2d at 479. However, resolution of this question does not end our inquiry.

The panel has determined that the remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. See RCW 2.06.040.

---

[8] Coalition for the Homeless noted that "[a] social worker employed by DSHS testified by affidavit that the parents' procurement of safe and stable housing is a precondition to the return of the children in 90 percent of her caseload." 133 Wn.2d at 921 n. 7.

- 8 -

*Unpublished Text Follows*

B.      Whether Housing Services Were Provided

To meet the requirement of providing necessary services, the Department must "[a]t a minimum . . . provide a parent with a list of referral agencies that provide those services."  In re Dependency of D.A., 124 Wn. App. 644, 651, 102 P.3d 847 (2004).  Additionally, "the court may consider any service received, from whatever source, bearing on the potential correction of parental deficiencies."  Id. at 651–52.  Finally, "[w]here, as here, the claim is that the Department failed to offer or provide a service, termination is appropriate if the service would not have remedied the parental deficiency in the foreseeable future."  D.H., 195 Wn.2d at 719.

Here, B.L. testified that she had a Section 8 Housing Choice Voucher (Section 8) and was assigned to work with a housing specialist through the Housing Authority of Snohomish County.  She also admitted that if she had entered inpatient substance use treatment as recommended by her evaluator, she would have had housing for six months.  Department caseworker Crystal Kraft testified that she provided B.L. with "connections" to housing services, the Department paid between $600–700 in outstanding utility bills incurred by B.L., and assisted her with finding shelters.  This is above the minimum of providing a list of referrals, and in light of services B.L. received from other sources, substantial evidence supports the trial court's finding that the Department offered all necessary services.

B.L. argues that because she explicitly asked Kraft for assistance with a referral to a housing program and did not receive a response, the Department did

not provide housing services. However, B.L. admits she never followed up about the program between the winter of 2019 and the termination proceeding in September 2020, and admits she also emailed her housing specialist about the program, who also failed to respond.

While safe and stable housing was an explicit parental deficiency, the court focused on B.L.'s substance use and lack of engagement in treatment in making its termination decision. At B.L.'s substance use evaluation, the recommendation was for inpatient treatment and the court found "Ms. [B.L.] simply has not engaged . . . and does not wish to comply." The court stated that G.L.L. had been out of B.L.'s care most of her life, and there was "at best, minimal progress" by B.L. during the dependency. During closing argument, the Department emphasized B.L.'s lack of engagement in substance use treatment, noting that "the biggest issue for the mother here is her chronic substance use," and referred to the mother's testimony at trial that she had last used meth one week prior.

As the Department notes, B.L. would have had stable housing for six months if she had entered inpatient substance use treatment. B.L. testified that she initially did not want to enter inpatient treatment because she would lose her Section 8 voucher, however, the voucher had been extended for a year. B.L. further testified that she did not want to enter inpatient treatment because G.L.L. would not have been able to stay with her during that time. However, B.L. had not made in-person visits with G.L.L. between August 2019 and September 2020 and was inconsistent with her participation in phone call visits.

Safe and stable housing is always an incredible asset to someone seeking treatment and certainly contributes to overall stability. However, because the Department provided housing services, and B.L. was receiving housing services elsewhere, and because the primary deficiency impacting reunification was substance abuse, substantial evidence supports the trial court's finding.

III.    Notice of Deficient Parenting Skills

B.L. alleges the trial court violated her right to due process because she received inadequate notice that the Department would be seeking termination based in part on a lack of parenting skills.

We review an alleged deprivation of due process de novo. W.W.S., 14 Wn. App. 2d at 353. In a dependency proceeding, "due process requires that parents have notice, an opportunity to be heard and defend, and the right to assistance of counsel." Id. at 353–54. It is "critical that parents receive notice of the specific issues to be considered" to "'prevent surprise, helplessness and disadvantage,'" and so they may intelligently decide whether to contest or admit the petition. In re Dependency of A.M.M., 182 Wn. App. 776, 791, 332 P.3d 500 (2014) (quoting In re Welfare of Martin, 3 Wn. App. 405, 410, 476 P.2d 134 (1970)).

In A.M.M., this court held there was inadequate notice where "[n]either the termination petition nor the dependency petition stated that [the mother's] lack of knowledge regarding her children's developmental needs constituted a parental deficiency." Id. at 792. In W.W.S., this court distinguished A.M.M., noting that "'[d]ue process is a flexible concept that may vary with the interests that are at stake,'" and, unlike A.M.M., there were several allegations in the petition and in

later motions referencing parental deficiencies of educational neglect and mental health issues. 14 Wn. App. 2d at 355–56 (alterations in original) (quoting In re Welfare of F.M.O., 194 Wn. App. 226, 276, 374 P.3d 273 (2016)).

Here, the termination explicitly states that "parenting deficiencies include [ ] lack of parenting skills." The petition also states B.L. had not been visiting G.L.L. on a regular basis and "has not demonstrated the ability to care for her child." Additionally, the petition states B.L. "does not understand and is incapable of providing for the child's emotional, physical, mental, and developmental needs. The mother is incapable of safely parenting the child."

These allegations mirror the testimony at trial. Kraft testified that B.L. failed to understand G.L.L's development and mental health and was not "able to meet those needs," or even "understand what she needs to do to be able to meet those needs." Kraft also identified "showing up for and providing the basic needs of the child," and demonstrating consistency and a routine as additional "basic" parenting skills which B.L. lacked. She explained that B.L. failed to show up for many visits and otherwise establish she was able to provide for G.L.L.

Like W.W.S., B.L. was not "rendered surprised, helpless, or disadvantaged" when the allegations in the termination petition "were tested at the hearing." See Id. at 357. Because B.L. had adequate notice the Department was seeking termination, in part, based on her lack of parenting skills, her due process rights were not violated.

IV.     Mental-Health-Related Deficiency

B.L. argues the juvenile court's finding that she had a mental-health-related deficiency is not supported by substantial evidence because the court made no findings about what her mental health issues were or how they impacted her ability to care for her child.

Again, we review the trial court's decision for sufficient evidence, based on the record as a whole. In re Welfare of H.S., 94 Wn. App. 511, 519, 973 P.2d 474 (1999). "[T]he ultimate fact in issue must be shown by substantial evidence to be 'highly probable.'" Id. Mental illness alone is not enough to find a parent unfit. In re Dependency of T.L.G., 126 Wn. App. 181, 203, 108 P.3d 156 (2005). In considering allegations of mental-health-related parental deficiencies, "[t]he court considers behavior manifesting mental illness within the totality of the circumstances." H.S., 94 Wn. App. at 528. "A child should not be left in the custody of a parent whose mental illness renders the parent unable to understand or meet the needs of the child." Id.

In T.L.G., the trial court erred in finding unfitness based on mental illness where "there was no parenting evaluation, no testimony connected the parents' mental health issues to parental deficiencies, and no mental health services treatment was offered over the two years of the dependency." 126 Wn. App. at 205. This case differs. The permanency planning order includes "[m]ental health counseling" as one of the court-ordered services, and mental health assessment and counseling were included in the Department's services letter. B.L. also admitted she experienced psychosis, causing her to miss visits because she was

- 13 -

"kind of scared to talk to" G.L.L. B.L. further testified that she was arrested for robbery due to this period of psychosis.

Because the court ordered mental health services, and B.L. testified about both experiencing psychosis and its impact on her ability to parent, there was substantial evidence to support the trial court's finding of a mental-health-related deficiency.

V.      Other Findings of Fact

Finally, B.L. assigns error to three other findings of fact: (1) that she did not meaningfully engage in substance use treatment, (2) that she had "no actual engagement" in random urinalysis (UA), and (3) that she is currently unfit to parent.

B.L. dedicates only one footnote in her brief to these assignments of error. She argues that her "self-motivated efforts" to enroll in treatment shows that all these findings lack substantial evidence. These "self-motivated efforts" consists of enrolling in a diversion center. There is no indication in the record as to how long B.L. was at the diversion center, but it does show that she eventually left due to a conflict with another resident. She had a substance use evaluation while there and received a bed date for an inpatient facility, but did not attend. B.L. also entered a detox program in June 2020, but never completed it. Kraft testified that B.L.'s only participation in substance use treatment was "a few sessions at Mill Creek Family counseling" as part of the family drug treatment court program. B.L. stipulated that G.L.L. was dependent in March 2019, and the termination hearing took place in September 2020. In 18 months, B.L.'s engagement in substance use treatment consisted of an incomplete detox program, a substance use evaluation,

and a few sessions of outpatient counseling. However, all treatment providers recommended inpatient, not outpatient, substance use treatment. The trial court's finding that she did not meaningfully engage in treatment is supported by substantial evidence.

B.L. was also ordered to submit to random UA testing. Kraft testified that she "sometimes" participated in UAs during the several weeks she was in the family drug treatment court program, but otherwise had not submitted UAs. Substantial evidence supports the trial court's finding that B.L. made "no actual engagement" in UA testing.

Based on all of the above findings that are individually supported by substantial evidence, the trial court's ultimate finding that B.L. is currently unfit to parent is properly supported. Further, B.L.'s termination fact-finding hearing comported with due process.

Affirmed.

WE CONCUR:

Andrus, A.C.J.