IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the matter of the Dependency of | No. 83842-3-I (consolidated with No. 83843-1-I) |
| B.S. and M.S., | DIVISION ONE |
| Minor Children. | UNPUBLISHED OPINION |

SMITH, A.C.J. — The trial court terminated A.S.'s parental rights as to his children B.S. and M.S. It found that his parental deficiencies were partly related to his mental health challenges. A.S. had been in counseling for years, and no additional treatment was recommended by service providers, so the Department of Children, Youth and Families itself did not provide him with other treatment. He now asserts that they should have. He also asserts that the trial court should have exercised its powers in equity to encourage the parties to the termination action to engage in open adoption negotiations after trial concluded but before a termination order was entered.

We affirm, concluding that substantial evidence supports the conclusion that no additional treatment would have remedied his parental deficiencies in the children's near future, and that this court's recent decision in In the Matter of the Dependency of A.N.C. is dispositive as to his equitable powers argument. No. 83086-4-I, slip op. (Wash. Ct. App. Nov. 21, 2022), https://www.courts.wa. gov/opinions/pdf/830864.pdf.

FACTS

A.S. and S.W. have two children together: B.S. and M.S. Two days after B.S.'s birth, the Department of Children, Youth and Families (DCYF) received a report from Providence Hospital expressing concerns about A.S. and S.W.'s behavior. DCYF filed a dependency petition the next day, citing concerns about S.W.'s drug seeking behavior in the hospital and A.S.'s habit of either sleeping while at the hospital or being totally absent. B.S. was initially placed with his maternal aunt, but was quickly relocated to the foster family with whom he continued to live throughout the proceedings of this case. B.S.'s dependency was established as to A.S. on November 1, 2018 after a hearing at which he did not appear. Dependency was established as to S.W. after a hearing on January 23, 2019.

S.W. gave birth to M.S. a few months later. She had tested positive for methamphetamines at an emergency room visit only a couple weeks beforehand. After M.S.'s birth, A.S. behaved "in an aggressive erratic and highly unusual manner" with hospital staff, and was eventually escorted away by security. DCYF received an intake request from Swedish Edmonds Hospital two days later, took M.S. into its custody, and placed the child with the same foster family as B.S. Dependency was established after a contested trial on November 27, 2019.

A.S. was ordered to complete a drug/alcohol evaluation, undergo random urinalysis, establish a safe living environment for the children, attend parenting

class for parents of infants, complete a domestic violence evaluation, and follow all recommendations from these evaluations. He engaged with these services to varying degrees. He completed a drug/alcohol assessment, which concluded that he did not meet the diagnostic criteria for substance use disorder and did not recommend follow up care. He attended some of his ordered drug tests while missing others, and tested positive for marijuana, which he reported he used to self-treat back pain and mental health issues.

A.S.'s attendance at parenting classes was sporadic, and the subject of much discussion at trial. He successfully completed four parenting classes by September 2020. DCYF then offered Parent Child Interaction Therapy (PCIT). After initially engaging with the service, he stopped attending and was dropped from the program in May 2021. He expressed interest in reattempting PCIT in December 2021, and had continued to engage with that service to some degree at the time of trial, in February 2022.

Starting in December 2019, A.S. was offered domestic violence intervention treatment as a part of the Social Treatment Opportunity Program (STOP). Although STOP is located in Kent and A.S. lives in Everett, he was able to attend by video. Despite this, he had ceased attendance by April 2020. He reengaged to an extent after receiving notice in June that the program would disenroll him. But by late 2020, he was once again not attending. This pattern of sporadic engagement followed by disengagement continued through the start of trial, at which point he had completed only a third of the course.

S.W. elected to voluntarily relinquish her parental rights as to B.S. and M.S. at the beginning of trial so that she could enter into an open adoption agreement. A.S. instead proceeded to trial. The trial court terminated his parental rights as to both B.S. and M.S. It did so in part because of his lack of engagement with the services provided by DCYF, as described above, and also because of his subsequent failure to cure his several parental deficiencies.

First, the trial court found that A.S. had parental deficiencies related to domestic violence. It cited his multiple domestic violence convictions in support of this finding. It also described serious concern over his angry outbursts, starting at the hospital at M.S.'s birth and continuing throughout the course of dependency and termination. Testimony described, for instance, an outburst while at Chuck E. Cheese for one of the children's birthdays. A.S. first became irate and yelled at S.W. and then "shut down" and refused to say anything to anyone present. This was not an isolated event. On another occasion, A.S.'s treatment of S.W. was bad enough that the visitation supervisor ended a visit early after feeling a need to physically interpose herself between the two of them. He would berate and argue with S.W. in front of M.S. and B.S. despite the visitation supervisor repeatedly telling them to move the argument outside the children's presence. These sorts of outbursts were common to the point that B.S.—at that point only three years old—developed a habit of standing between S.W. and A.S. when they occurred.

4

Second, the trial court found that A.S. had a parental deficiency related to his parenting skills. He "lacked insight into the basic needs of his children" and was "incapable of providing for the children's emotional, physical, mental, and developmental needs." It cited his frequent abandonment of parenting duties such as preparing meals for the children, and his inattentiveness to issues of safety, particularly when walking near busy roads. It also described how A.S. would not engage with the children unless S.W. was present. He never parented the children alone, instead cancelling any visit if S.W. was absent.

Third, the trial court found that A.S. had a parenting deficiency related to substance abuse. A.S. admitted to daily use of cannabis, but also refused to take drug testing for other drugs. Moreover, he continued to live with S.W., who was an active user and had tested positive for methamphetamines multiple times over the course of these dependency and termination cases.

Finally, the trial court found that A.S. had parental deficiencies related to his mental health, which will be discussed at length below.

A.S. appeals.

ANALYSIS

Standard of Review

We review the trial court's decision to terminate parental rights by considering "whether substantial evidence supports the trial court's findings of fact by clear, cogent, and convincing evidence." In re the Parental Rights of K.M.M., 186 Wn.2d 466, 477, 379 P.3d 75 (2016). This requires that the facts be shown to be " 'highly probable.' " In re Welfare of Sego, 82 Wn.2d 736, 739, 513

5

P.2d 831 (1973) (quoting Supove v. Densmoor, 225 Or. 365, 358 P.2d 510 (1961)). Because termination proceedings are "highly fact-specific," the reviewing court defers to "the trial court's determinations of witness credibility and the persuasiveness of the evidence." K.M.M., 186 Wn.2d at 477. Whether the trial court's findings of fact support its conclusions of law is reviewed de novo. K.M.M., 186 Wn.2d at 477.

Necessary Services under RCW 13.34.180(1)(d)

A.S. first challenges whether DCYF met its burden to prove that it provided him with all the necessary services mandated by RCW 13.34.180(1)(d). He specifically asserts that the State failed to provide necessary services to address parenting deficiencies related to his mental health. We reject this argument because while DCYF itself did not provide him mental health services, he was nonetheless receiving mental health treatment from a counselor. Furthermore, there was no indication that A.S. needed to participate in any other form of mental health treatment.

Due process ensures that parents possess a constitutionally protected fundamental liberty interest in the custody and care of their children. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). For the State to terminate those rights, it must demonstrate by clear, cogent, and convincing evidence that it has met the six requirements laid out in RCW 13.34.180(1). RCW 13.34.190(1)(a)(i). "Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown by the evidence to be

'highly probable.' " In re Dependency of K.R., 128 Wn.2d 129, 141, 904 P.2d 1132 (1995) (quoting Sego, 82 Wn.2d at 739). After it meets this burden, the State must also show by a preponderance of the evidence that termination is in the best interests of the child. RCW 13.34.190(1)(b); In re Dependency of A.V.D., 62 Wn. App. 562, 571, 815 P.2d 277 (1991).

A.S. challenges whether the State met the fourth of RCW 13.34.180's six elements, which requires "[t]hat the services ordered [by the court] have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d). " 'Necessary services' " under the statute are services that are " 'needed to address a condition that precludes reunification of the parent and child.' " K.M.M., 186 Wn.2d at 480 (quoting In re Dependency of A.M.M., 182 Wn. App. 776, 793, 332 P.3d 500 (2014)). Services must be tailored to the parent's needs, there is no one size fits all approach. In re Parental Rights of D.H., 195 Wn.2d 710, 727, 464 P.3d 215 (2020). When determining whether necessary services have been provided, the "court may consider any service received, from whatever source, bearing on the potential correction of parental deficiencies." In re Dependency of D.A., 124 Wn. App. 644, 651-52, 102 P.3d 847 (2004) ("[The appellant] does not explain how receiving this service from the Department would have made a difference."); see also In re Dependency of C.T., 59 Wn. App. 490, 496-97, 798 P.2d 1170 (1990)

("[t]he consideration of any services offered prior to deprivation proceedings could be reasonably considered as bearing on the potential correction of parental deficiencies."); In re Dependency of G.L.L., 20 Wn. App. 2d 425, 499 P.3d 984 (2021) (Department benefitted from provision of housing vouchers under another program). If DCYF fails to offer necessary services, "termination may still be appropriate if the service would not remedy the parent's deficiencies within the foreseeable future." K.M.M., 186 Wn.2d at 486.

Here A.S. asserts that he suffers from posttramatic stress disorder (PTSD), anxiety, and depression, that treatment of these mental health issues was necessary to correct his parental deficiencies, and that the DCYF did not provide appropriate services. He therefore challenges whether substantial evidence supported the trial court's finding 2.132: "All necessary services reasonably available, capable of correcting the parents' [sic] parental deficiencies within the foreseeable future, have been expressly and understandably offered or provided to the parents." Two unchallenged findings are relevant to our analysis of this issue.[1] First, that A.S. "has a parental deficiency related to mental health." Second, that both children's foreseeable futures are three to six months. A.S.'s argument is unavailing; substantial evidence supports the trial court's finding 2.132.

A.S. had been voluntarily seeing Ashley Flowers, a mental health counselor at Compass Health, since before B.S.'s birth. At the time of trial, he

---

[1] Unchallenged findings of fact are verities on appeal. Robel v. Roundup Corp., 148 Wn.2d 35, 42, 59 P.3d 611 (2002).

estimated that he had been visiting Flowers for around six years. Flowers himself did not testify at trial but did, through a letter admitted as evidence, indicated that A.S., a past client, had reentered services in August, 2020—a year and a half before trial—to "prepare himself for successful reunification with his family." A.S. met with Flowers in person until the outbreak of the COVID-19[2] pandemic and continued to meet with him by phone thereafter. Testimony varied slightly concerning the frequency of treatment, but all indicated that it was consistent—A.S. estimated that he saw Flowers monthly for around 15 minutes a session. Flowers's written statement differed slightly; he reported that he met with A.S. every two weeks and that A.S. had not missed a meeting.

Though the content of the treatment was not discussed in depth at the trial court, A.S. testified that he and Flowers would "work on anything" and "just talk," that they discussed methods of dealing with stress and emotional regulation, and that he benefited from their discussions. A.S. testified that he had never been diagnosed with any specific mental health disorder, such as anxiety or depression, other than PTSD related to his mother's passing when he was a child, a diagnosis he had received at the beginning of his treatment by Flowers. He believed that the counseling he received from Flowers had helped him with his PTSD.

---

[2] COVID-19 is the World Health Organization's official name for "coronavirus disease 2019," a severe, highly contagious respiratory illness that quickly spread throughout the world after being discovered in December 2019.

Flowers left Compass Health around a month and a half before trial, but A.S. had already begun treatment with another counselor at Compass Health. A.S. was not on any medication for his PTSD or any undiagnosed mental health disorder, at least in part because Flowers did not prescribe medication, but also did not believe medication was needed.  When asked whether DCYF could have provided him with additional mental health treatment that would have helped address his deficiencies, A.S. denied that they could have, but did assert that he believed anger management classes may have been appropriate as an alternative to his domestic violence course.

Two service providers who evaluated A.S. over the course of the termination indicated that he may have mental health issues, but neither recommended any treatment beyond what he was already receiving from Flowers.  His substance use disorder assessor, Deb Winston, concluded that he "d[id] not meet DSM 5 diagnostic criteria for Substance Use Disorder" and, though she was aware of his PTSD diagnosis and his treatment at Compass Health, did not recommend any additional treatment referral.  His domestic violence assessor, Melanie Miller, testified to using screening questionnaires to identify co-occurring disorders or conditions during the intake process for domestic violence classes.  Though not herself a credentialed mental health provider, she often referred individuals to such providers where the screening questionnaires gave reason to.  In their screening, A.S. self-reported having PTSD, and Miller observed possible indicators of anxiety and depression.  She

therefore recommended that he continue his preexisting counseling, though it is unclear from the record to what extent she questioned A.S. about his treatment with Flowers.

There is substantial evidence to support the trial court's finding 2.132, satisfying RCW 13.34.180(1)(d)'s requirements. DCYF was entitled to rely on the services already being provided to A.S. by Flowers. The evaluators who indicated that he may benefit from mental health services did not recommend anything other than the continuation of his existing counseling sessions with Flowers. In fact, A.S. himself did not testify to believing any further mental health services were necessary. Additionally, there is no indication that continuation of services for another three to six months—the children's foreseeable future— would have resolved any parental deficiencies related to mental health. Six years of counselling with Dr. Flowers, one and a half of which focused at least in part on A.S.'s reunification with his children, had already failed to do so. We find no error.[3]

<u>The Court's Equitable Powers to Encourage Open Adoption</u>

A.S. next contends that the trial court failed to recognize and exercise equitable powers that it could have employed, after the close of trial but before

---

[3] A.S. assigns error to a total of 42 specific findings of fact made by the trial court. He does not devote a distinct portion of his brief to any of these findings. Many, however, are addressed indirectly in his argument about mental health services. To the extent that these findings are intertwined with the above discussion about the necessary provision of mental health services, we conclude that they are supported by substantial evidence. Those that are unaddressed, we decline to review. See State v. Elliott, 114 Wn.2d 6, 15, 785 P.2d 440 (1990) ("This court will not consider claims insufficiently argued by the parties.").

ordering termination, to encourage the parties to pursue an open adoption agreement.[4]  He asserts that equity empowers the courts to step into those factual scenarios the termination statute does not address to serve the best interests of children.  The "statutory gap" A.S. identifies permitting equity exists, he asserts, where "the court finds it is in the child's best interests to terminate an unfit parent's rights *and* facilitate post-termination contact."  We reject this argument for several reasons, but particularly because a recent case, A.N.C., published after the parties in this case submitted their briefing, held that the court's equitable powers do not have a role to play in this scenario.  Slip op. at 17

As an initial matter, the State points out that this argument is raised for the first time on appeal.  Issues not argued before the trial court are typically subject to review only at the discretion of appellate court.  RAP 2.5.  "[M]anifest error affecting a constitutional right," however, is appealable as a matter of right.  RAP 2.5(a)(3).  A.S. contends, relying on In re Dependency of A.A., No. 78021-2-I (Wash. Ct. App. Jan. 22, 2019) (unpublished) https://www.courts.wa.gov/opinions/pdf/780212.pdf, that his right to an open adoption agreement is constitutional in nature, and therefore appealable under RAP 2.5(a)(3).  A.A. does not have precedential power, and A.N.C., which does, concluded that no constitutional right exists to open adoption after a termination

---

[4] Open adoption agreements are agreements that enable continued communication or contact between birth parents and their children who have been adopted.  They are governed by RCW 26.33.295.  Open adoption agreements are legally enforceable and made by agreement of the birth parents, prospective adoptive parents, and sometimes guardians ad litem and DCYF. RCW 26.33.295(2), (4).

trial has occurred. Slip op. at 17. We elect to hear the issue nonetheless.[5] See RAP 2.5(a) ("The appellate court *may* refuse to review any claim of error which was not raised in the trial court.") (emphasis added).

Next, there is a procedural impediment involved in A.S.'s assertion concerning the use of the court's equitable powers. The trial court did not find that ongoing contact between A.S. and his children is in the children's best interest. The guardian ad litem for the children did testify to that effect, but testimony at trial can often support a variety of conclusions, and its existence alone does not equate to a judicial finding. This case does not, therefore, sit in the gap identified by A.S., regardless of his argument's substantive merit.

Finally, we have recently addressed the use of the court's equitable powers in this circumstance. "[T]he courts' equitable powers . . . serve the limited but crucial purpose of enabling remedy to enforce an existing right where remedy would not otherwise be available under the law." A.N.C., slip op. at 12.

---

[5] In what is either a related argument or an extension of the same one, the State asserted that "[A.S.] didn't ask for this relief below, *he's not even here telling the court that he is interested in an open adoption agreement, there's no guarantee that there's even going to be a willing participant in the form of the father*, and yet he's asking for reversal of his termination of parental rights." Wash. Court of Appeals oral argument, In re Dependency of B.S., No. 83842-3-I (Oct. 25, 2022), at 12 min., 21 sec., audio recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2022101168/?eventID=2022101168. A.S.'s subjective interest in an open adoption is not, however, relevant to our analysis, which focuses on whether he objectively holds a right, and whether that right was in some way violated. To the extent that the State's framing puts the burden on appellants to preserve even manifest constitutional errors, it is incorrect. It is also questionable because, regardless of what the record below contains or omits, A.S. is currently appealing the termination of his parental rights by asserting an interest in open adoption.

But "[n]o parental right to open adoption exists—statutory, constitutional, or equitable—to be enforced through the courts' equitable powers after a termination trial has occurred." A.N.C., slip op. at 17. The trial court did not err in not exercising its equitable powers; A.N.C. held that those powers cannot provide the remedy A.S. seeks.

We affirm.

Smith, A.C.J.

WE CONCUR:

Birk, J.

Andrus, C.J.