IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parental Rights to:<br><br>J.L.L.M.-M.,<br><br>          a Minor Child. | No. 83958-6-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, A.C.J. — After a trial, Ms. M's parental rights to J.L.L.M.-M. were terminated. She now appeals, arguing that the Department of Children, Youth, and Families failed to provide all court-ordered and necessary services as required under statute, specifically housing and domestic violence survivor services. Because neither of those services were court-ordered or necessary, her challenge fails and we affirm.

## FACTS

On October 3, 2019, Ms. M gave birth to J.L.L.M.-M.,[1] who was subsequently removed from her care after medical testing showed that the infant had been exposed to amphetamines and cannabis. The Department of Children, Youth, and Families (the Department) filed a dependency petition and, on October

---

[1] Throughout the record, various witnesses refer to the child by his first name only. Accordingly, we refer to the child as J.

10, 2019, the trial court entered an agreed shelter care order that placed J with his maternal aunt and allowed Ms. M supervised visitation. Two months later, the trial court entered a dependency order that placed J in licensed foster care. Six months after that, J was placed in relative care with Ms. M's cousin.

On April 27, 2021, the court held a dependency review hearing and found Ms. M was in partial compliance with the court order, noting that she had not visited J since October 2020, and she had not made progress toward correcting the problems that necessitated the dependency. The trial court modified the permanency plan from reunification to adoption and instructed the Department to file a termination petition pursuant to RCW 13.34.136(3). The Department filed the petition, and the trial took place over March 7 and 8, 2022. Following the trial, the court granted the Department's petition, terminating the parent-child relationship between Ms. M and J. Ms. M timely appealed.

ANALYSIS

Ms. M argues that the trial court erred in entering the termination order because the Department failed to meet its burden to establish all statutory elements by clear, cogent, and convincing evidence. Specifically, Ms. M assigns error to three of the trial court's findings related to the Department's obligation to provide all necessary services, as well as the corresponding conclusion of law. Further, Ms. M contends the trial court erred by considering whether termination was in the best interests of the child because "the Department had not met its statutory obligation to provide all necessary and available services."

"Chapter 13.34 RCW creates a two-step framework for terminating parental rights." In re Parental Rights to K.M.M., 186 Wn.2d 466, 478, 379 P.3d 75 (2016). First, the Department must "establish the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence." In re Parental Rights to D.H., 195 Wn.2d 710, 718, 464 P.3d 215 (2020). Those six elements are as follows:

1. That the child has been found to be a dependent child.
2. That the court has entered a dispositional order pursuant to RCW 13.34.130.
3. That the child has been removed or will, at the time of the hearing, have been removed from the custody of the parent for a period of at least six months pursuant to a finding of dependency.
4. That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.
5. That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future.
6. That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1)(a)-(f). Second, pursuant to RCW 13.34.190(1)(b), the Department "must prove by a preponderance of the evidence that termination of parental rights is in the best interests of the child." In re Welfare of A.B., 181 Wn. App. 45, 59, 323 P.3d 1062 (2014).

On review, we "will not disturb the findings of the trial court as long as they are supported by 'substantial evidence.'" In re Welfare of Hall, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983) (quoting In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). Substantial evidence is "sufficient to persuade a fair-minded rational person of the truth of the declared premise." A.B., 181 Wn. App. at 59. However, as the State must prove each statutory element by "clear, cogent, and

convincing evidence," the evidence in the record must be more substantial than that needed to prove something by a mere "preponderance of the evidence." Hall, 99 Wn.2d at 849. This heightened burden of proof requires evidence showing that the trial court's findings are "'highly probable.'" In re Dep. of A.M.F., 23 Wn. App. 2d 135, 141, 514 P.3d 755 (2022) (internal quotation marks omitted) (quoting Sego, 82 Wn.2d at 739). This court defers to the trial court's determinations on the credibility of witnesses and does not re-weigh evidence. D.H., 195 Wn.2d at 718.

I.    All Necessary Services

Ms. M's first assignment of error focuses on the trial court's findings concerning the Department's obligation to provide all court-ordered and necessary services under RCW 13.34.180(1)(d), particularly with regard to housing and domestic violence services. Ms. M's assertion rests on the premise that housing and domestic violence survivor services, while not court-ordered, were both necessary based on the termination petition.[2] We disagree.

The Department must "identify a parent's specific needs and provide services to meet those needs" prior to terminating that parent's rights. In re Parental Rights to I.M.-M., 196 Wn. App. 914, 924, 385 P.3d 268 (2016)). Simply because a service is not court-ordered does not mean that service is not necessary. In re Dep. of G.L.L., 20 Wn. App. 2d 425, 432, 499 P.3d 984 (2021).

---

[2] Though Ms. M assigns error to finding of fact 2.15, alleging that the Department did not expressly and understandably provide "all necessary services," her argument addresses only the Department's failure to provide services for domestic violence and housing, both of which she avers were necessary here. Appellant's Br. at 20-23.

In addition to court-ordered services, the Department is obligated to offer or provide any and "all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future." RCW 13.34.180(1)(d). A service is "'necessary'" when it is "needed to address a condition that precludes reunification of the parent and child." I.M.-M., 196 Wn. App. at 921 (citing In re Welfare of C.S., 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010)). To fulfill its statutory obligation to offer or provide all necessary services, the Department must, at least, "provide a parent with a list of referral agencies that provide those services." In re Dep. of D.A., 124 Wn. App. 644, 651, 102 P.3d 847 (2004). However, "the court may consider any service received, from whatever source, bearing on the potential correction of parental deficiencies." Id. at 651-52. Importantly, when a claim is based on the Department's alleged failure to provide a service, "termination is appropriate if the service would not have remedied the parental deficiency in the foreseeable future." D.H., 195 Wn.2d at 719 (citing RCW 13.34.180(1)(d)).

Here, Ms. M expressly disputes findings of fact (FF) 2.15.8 and 2.15.9 in her assignments of error. In FF 2.15.8, the court found that the "Department attempted to identify and remove any barriers preventing Ms. [M] from engaging in services." In FF 2.15.9, the court further found that, "The Department's efforts were timely and consistent." While FF 2.15.9 is specifically set out in the assignments of error in Ms. M's opening brief, she provides no argument as to how this finding was unsupported by the record. "If a party fails to support assignments of error with legal arguments, they will not be considered on appeal." In re Dep. of

D.L.B., 188 Wn. App. 905, 909 n.1, 355 P.3d 345 (2015).  Accordingly, we decline to address that challenge.

The primary parenting deficiencies identified in the termination petition were Ms. M's substance abuse and mental health; those issues were referenced in six of the eight identified deficiencies.  To address those core deficiencies, Ms. M was ordered to obtain a drug and alcohol evaluation as well as a psychological evaluation with a parenting component and to follow the respective treatment recommendations.  She was also ordered to complete random urinalysis (UAs) once per week for 90 days.  Though Ms. M testified that she completed a substance abuse evaluation in September 2020, she acknowledged that she did not follow the treatment recommendations, and "none of [the UAs] came back clean" during her testing period.  Ms. M further acknowledged that she used methamphetamine four days before the termination trial.  Ms. M also failed to complete her psychological evaluation and admitted that she had not seen J, who was two-and-a-half years old at the time of the trial, since his first birthday.

A.      Housing Services

The record does not indicate, and Ms. M did not testify, that she was homeless at any point during the dependency or termination proceedings.  However, the Department's termination petition did list, as a parental deficiency, "Instability of housing due to criminal [sic], mental health, drug use."  (Emphasis added.)  At the termination trial, Ms. M testified that she had been living with her twin sister for the previous three weeks.  Prior to staying with her sister, Ms. M stated that she was residing in a hotel in Fife.  When asked where else she had

been staying over the past three years, Ms. M testified that "[t]he first year, I was on Pacific Highway, staying with an ex-boyfriend," and that she lived on her own in Fife during the following two years. She also confirmed she had not resided in any other location or lived with anyone else during that time period. Ms. M stated she "refuse[d] to stay on the streets."

While Ms. M was living in the motel in Fife, she received multiple letters from her social worker, Jessica Hinkson, informing her of "what [she] needed to do." Ms. M was aware of her court-ordered services, including her obligation "to get a drug and alcohol evaluation and assessment." She was also aware that she needed to get a psychological evaluation and was directed to visit a "Dr. Swing" in Seattle to do so. Ms. M explained she "was having difficulty with getting to [Swing] because I was in Fife and [Swing] was in Seattle." Ms. M further noted that she was "asked to transport out there on a Saturday, which [was] kind of difficult for me." When Ms. M was asked if she told Hinkson about her transportation issues, she answered affirmatively, testifying that, after she expressed her concern to Hinkson, "Swing offered to pay for a Lyft or an Uber for me." According to Ms. M, however, she was not able to take advantage of Swing's offer because her phone had been stolen. Ms. M explained that "people kept stealing from [her]" at the Fife motel. Although she was able "to obtain a few new phones," Ms. M never got back in touch with Swing to set up a psychological evaluation.

Hinkson testified that she attempted to obtain more stable housing for Ms. M, and explained that she submitted a housing voucher for Ms. M to the "family unified program" (FUP). Hinkson characterized FUP as a program that can house

parents in "a more specialized system for Section 8." Ultimately, Hinkson established, the voucher "wasn't accepted by the program and [Ms. M] was put in a control group where she was not going to be put on the list for a housing voucher." Hinkson also tried to get Ms. M into an inpatient treatment facility; she testified that she provided Ms. M with a list of inpatient treatment facilities and called different ones in the area to inquire as to open beds for Ms. M. But, because Ms. M "did not sign the appropriate releases of information," Hinkson could not "move any further with trying to get [Ms. M] into a facility."

Ms. M relies on G.L.L. to argue that housing constituted a necessary service here. 20 Wn. App. 2d 425. However, G.L.L. is distinguishable. In that case, the Department filed a termination petition that identified "lack of safe and stable housing" as a parental deficiency of the mother. Id. at 428. Although it was not identified as a "primary factor" preventing reunification, this court explained: "Lack of safe and stable housing was explicitly identified as a parenting deficiency in the termination petition. As such, it certainly could have precluded reunification. This makes it a necessary service." Id. at 433.

Unlike the termination petition in G.L.L. that clearly listed a lack of safe and stable housing as the deficiency in and of itself, the petition at issue here does not. Somewhat ambiguously, Ms. M's parental deficiency was listed as: "Instability of housing due to criminal [sic], mental health, drug use." (Emphasis added.) The explicit language of Ms. M's identified deficiency, unlike that in G.L.L., identifies housing instability as a result of her primary deficiencies, including untreated substance abuse and unresolved mental health issues. In other words, Ms. M's

"[i]nstability of housing" was not precluding reunification, rather, it was a symptom of the other identified parenting deficiencies. As such, housing was not a necessary service for Ms. M.

However, the particular phrasing of the parental deficiencies in this petition does create some ambiguity as to the Department's burden in the termination proceedings. Where the mother in G.L.L. was homeless, Ms. M was not, but the express inclusion of Ms. M's housing "instability" could be interpreted as expanding the Department's obligations in this case. Assuming arguendo that housing services were necessary here, based on the imprecise language contained in the petition, the Department's burden was satisfied. Notably, Ms. M confirmed that she had housing throughout the dependency. Because the court may consider other sources of services, outside of those provided by the Department, Ms. M's challenge on this issue fails. In re Dep. of C.T., 59 Wn. App. 490, 496-97, 798 P.2d 1170 (1990).

By her own testimony, Ms. M established that she was housed throughout the dependency and termination proceedings. Further, Hinkson testified that she attempted to place Ms. M at an inpatient treatment facility, which could have housed her for approximately six months. Hinkson also submitted a housing voucher to FUP on Ms. M's behalf. These efforts go beyond the Department's minimum statutory requirement to simply "provide a parent with a list of referral agencies that provide those services." D.A., 124 Wn. App. at 651.

Transportation was the only barrier to completion of court-ordered and necessary services that Hinkson and Ms. M identified at trial. Hinkson testified that

"the Department provided an ORCA[3] card" and bus tickets to Ms. M. However, the ORCA card was not renewed because Ms. M was not attending her appointments while it was active. Ms. M confirmed that the Department issued her an ORCA card and that Swing had offered to provide transportation for the psychological evaluation. Despite this assistance, Ms. M never completed the ordered services. Under the circumstances of this case, housing was not a necessary service, nor was it a primary barrier to Ms. M's compliance with the court's order, but, even if we reached a different conclusion as to these preliminary questions, FF 2.15 and 2.15.8 would still be supported by substantial evidence that the Department met its burden to offer improved housing opportunities to Ms. M.

B.      Domestic Violence Survivor Services

Ms. M next argues that domestic violence survivor services were necessary because her difficulty in contacting and meeting treatment providers was "exacerbated by a pattern of engaging in domestic violence relationships." The record does not support this contention.

Unlike the reference to "instability of housing" addressed above, Ms. M's status as a survivor of domestic violence was not mentioned anywhere in the deficiencies set out in the termination petition, directly or indirectly. Additionally, while Ms. M testified that she was involved in relationships when she was pregnant with J wherein she experienced domestic violence, she further explained that the most recent of those relationships ended two years before the termination trial.

---

[3] "One Regional Card for All" is a regional transit payment card that can be used by commuters to access several modes of public transportation with various transit agencies in the Seattle-Tacoma metro area. www.myorca.com.

After living with an abusive partner for one year, Ms. M testified that she moved to a motel in Fife where she lived alone for two years. Three weeks before trial Ms. M moved in with her sister.

Though the impact of domestic violence often extends well beyond the conclusion of the abusive relationship, and certainly may impact issues like mental health and substance abuse, there is nothing in the record to suggest J's safety was directly affected by his mother's experience with domestic violence, in part because there is no information that Ms. M was involved in an abusive relationship at any time during the proceedings. Notably, at trial, Ms. M did not identify domestic violence as a barrier to the completion of her court-ordered services to address the deficiencies precluding reunification; she explicitly testified that "the only barrier would be transportation." Nothing in any part of the record submitted to this court identifies domestic violence as a barrier to Ms. M's reunification with J.

At trial, Hinkson addressed domestic violence concerns only in passing when she stated she provided Ms. M with a pamphlet of services that included domestic violence services.[4] In closing argument, the Department referenced Ms. M's domestic violence history, but only as a summary of Ms. M's testimony. Further, a parent's status as a victim of domestic violence is not sufficient by itself to constitute a parental deficiency. In re Dep. of D.L.B., 186 Wn.2d 103, 124, 376

---

[4] In briefing, the Department contends that, as a matter of policy, domestic violence services for victims should be voluntary, citing the Social Worker's Practice Guide to Domestic Violence. Wash. Dep't of Soc. & Health Servs., Social Worker's Practice Guide to Domestic Violence 69 (Jan. 2016), https://www.dcyf.wa.gov/sites/default/files/pubs/22-1314.pdf. It explains that Department practice is to offer assistance when victims of domestic violence raise the concern, but not to urge or force them to take action, such as obtaining protection orders, in order to avoid increasing potential danger, and that this practice reduces the burdens imposed on victims.

P.3d 1099 (2016). As domestic violence services were not needed to address any condition that precluded the reunification of Ms. M and J, such services were not necessary. I.M.-M., 196 Wn. App. at 921.

Because domestic violence survivor services were not court-ordered, identified as a barrier to reunification such that they were rendered necessary, or cited by Ms. M as an obstacle to completing the other court-ordered and necessary services, her challenge to FF 2.15 and 2.15.8 on this basis fails.

II.     Statutory Elements for Termination

Ms. M next avers the trial court erred in concluding that the Department established all statutory elements required for termination.

This court "reviews de novo whether the [trial] court's findings of fact support its conclusions of law." K.M.M., 186 Wn.2d at 477. Ms. M's argument on this issue appears to focus on whether the Department satisfied its burden of proof as to the fourth element of termination: that the ordered and necessary services have been "expressly and understandably offered or provided." RCW 13.34.180(1)(d). In support of this contention, she explicitly avers that providing domestic violence and housing services would not have been futile here. However, because the two services identified on appeal were not necessary services under the language of the termination petition, this conclusion of law is sufficiently supported and we need not address futility.

Even if we accepted Ms. M's argument that housing services were necessary, such services were provided by the Department and she also accessed services through other means. More critical to the framing of this challenge as one

rooted in futility, Ms. M's own testimony demonstrates that, even if the Department had offered domestic violence survivor services and other options for housing, her primary obstacle to accessing them was transportation. The record establishes that even when she had transportation assistance, in the form of an ORCA card and bus passes, she still did not attend her appointments or otherwise engage with the services the Department arranged for her. Accordingly, the trial court's conclusion of law that the statutory standards were established by clear, cogent, and convincing evidence, logically flows from the findings of fact that are properly supported by the evidence contained in the record.

III.     Consideration of the Child's Best Interests

Rather than arguing the Department failed to establish that termination was in J's best interests, Ms. M argues that the trial court erred "by considering whether termination was in J's best interests, where the Department had not met its statutory obligation to provide all necessary and available services." (Emphasis added.)

As noted above, when deciding whether to terminate parental rights, we use a two-step process. In re Welfare of A.B., 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). First, the court considers the adequacy of the parent and whether the Department has established the statutory elements by clear, cogent, and convincing evidence. Id. Second, the court determines whether the Department has shown by a preponderance of the evidence that termination is in the best interests of the child. Id. "Only if the first step is satisfied may the court reach the second." Id.

Here, Ms. M raises a procedural challenge, not a substantive one. As clear, cogent, and convincing evidence supports the six statutory elements, including the Department's provision of all court-ordered and necessary services to Ms. M, the trial court properly proceeded to the second step of the analysis and considered whether the termination was in J's best interests. Thus, the trial court did not err.

Affirmed.

WE CONCUR:

Díaz, J.

Birk, J.